UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 27 2016

_____

L.B. and F.B., individually and on behalf of J.B.,

Plaintiffs,

–v–

The New York City Department of Education,

Defendant.

_____

15-CV-03176 (AJN)

MEMORANDUM
AND ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs L.B. and F.B. (the "Plaintiffs" or "Parents") bring this action, individually and

on behalf of their minor son, J.B., against the New York City Department of Education (the

"Defendant" or "DOE"), seeking review of a December 22, 2014 decision by State Review

Officer Carol H. Hague (the "SRO"), which reversed a July 26, 2012 decision by Impartial

Hearing Officer Michael S. Lazan (the "IHO") and found that the DOE complied with its

obligations under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§

1400 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et*

*seq.*, in developing a sufficient individualized education plan ("IEP") for J.B. and offering him a

free appropriate public education ("FAPE") for the 2010-11 school year.  Plaintiffs challenge the

SRO's decision and seek reimbursement for the cost of enrolling J.B. for the school year at the

Cooke Center for Learning and Development ("Cooke"), a private educational institution which

Plaintiffs unilaterally selected after rejecting the school placement recommended by the DOE.

As is common in IDEA actions, the parties have cross-moved for summary judgment pursuant to

1

Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, Plaintiffs'

motion is DENIED and Defendant's motion is GRANTED.

## I.     Background

### A.     Legal Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a [FAPE] that emphasizes special education and related services designed to meet their

unique needs and prepare them for further education, employment, and independent living."  20

U.S.C. § 1400(d)(1)(A).[1]  Under the IDEA, states have "an affirmative obligation to provide a

basic floor of opportunity for all children with disabilities," which means "an education likely to

produce progress, not regression, and one that affords the student with an opportunity greater

than mere trivial advancement."  *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016)

(internal quotation marks and brackets omitted).  "The 'centerpiece' of the IDEA and its

principal mechanism for achieving this goal is the IEP."  *Id.*  "An IEP is 'a written statement that

sets out the child's present educational performance, establishes annual and short-term objectives

for improvements in that performance, and describes the specifically designed instruction and

services that will enable the child to meet those objectives.'"  *N.M. v. N.Y.C. Dep't of Educ.*, 15-

cv-1781, 2016 WL 796857, at *1 (S.D.N.Y. Feb. 24, 2016) (quoting *R.E. v. N.Y.C. Dep't of

Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

The State of New York "has assigned responsibility for developing appropriate IEPs to

local Committees on Special Education ('CSEs')."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217,

---

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education Improvement Act.  All references to, and cases cited herein discussing, the IDEA remain authoritative. *See J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, 12-cv-2896, 2013 WL3975942, at 1 n.1 (S.D.N.Y. Aug. 5, 2013).

224 (2d Cir. 2012) (internal quotation marks and brackets omitted); *see also* N.Y. Educ. Law §
4402(1)(b)(1). "CSEs are comprised of members appointed by the local school district's board
of education, and must include the student's parent(s), a regular or special education teacher, a
school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175; *see also*
*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998). In developing the IEP,
the CSE is required to "examine the student's level of achievement and specific needs and
determine an appropriate educational program." *R.E.*, 694 F.3d at 175. "To comply with its
substantive obligations under the IDEA, a school district must provide 'an IEP that is likely to
produce progress, not regression.'" *N.M.*, 2016 WL 796857, at *1 (quoting *Cerra v. Pawling
Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005)). "If an IEP is substantively deficient, parents
may reject the CSE's plan and seek reimbursement from the state for private school tuition,
subject to certain conditions." *R.B. v. N.Y.C. Dep't of Educ.*, 15-cv-6331, 2016 WL 2939167, at
*4 (S.D.N.Y. May 19, 2016) (citing *T.K.*, 810 F.3d at 875; 20 U.S.C. § 1412(a)(10)(C)(ii)).
Parents may also seek reimbursement if an IEP is procedurally deficient, but only if the
deficiencies "significantly impede the parents' participation rights, impede the child's right to a
FAPE, or cause a deprivation of educational benefits." *T.K.*, 810 F.3d at 875 (internal quotation
marks and brackets omitted).

"To begin the tuition-reimbursement process, a parent must first file a due-process
complaint which triggers an administrative review process." *N.K. v. N.Y.C. Dep't of Educ.*, 961
F. Supp. 2d 577, 580 (S.D.N.Y. 2013) (internal quotation marks omitted) (citing 20 U.S.C. §
1415(b)(6), (f); N.Y. Educ. Law § 4404(1)). If the school fails to remedy any purported
deficiencies set forth in the due process complaint within thirty days, then, according to IDEA
mandate, the state provides an impartial due process hearing before an IHO. *See R.E.*, 694 F.3d

at 175, 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)). Under New York's Education Law

§ 4404(1)(c) and the so-called "*Burlington/Carter*" test, "the local school board bears the initial

burden of establishing the validity of its plan at a due process hearing. If the board fails to carry

this burden, the parents bear the burden of establishing the appropriateness of their private

placement and that the equities favor them." *R.E.*, 694 F.3d at 184-85 (internal footnote

omitted); *see also Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-16 (1993); *Sch. Comm.*

*of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985).

The decision of an IHO "can then be appealed to an SRO of the New York State

Education Department." *M.W. v. N.Y.C. Dep't of Educ.*, 869 F. Supp. 2d 320, 329 (E.D.N.Y.

2012) (internal brackets omitted), *aff'd* 725 F.3d 131 (2d Cir. 2013). "Only after exhaustion of

these procedures has an aggrieved party the right to file a suit in a federal or state court." *Cave v.*

*East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (citing 20 U.S.C. §

1415(i)(2)(A)).

### B. Factual Background

J.B. has a history of academic, speech and language, and attentional deficits that dates

back to his early childhood. DOE Ex. 8 (Social History Update, dated April 21, 2009) at 2.[2]

Verbal difficulties and delays were identified while J.B. was attending a regular education

private pre-school program, and he began to receive thrice weekly speech and language therapy

through the DOE's Committee on Pre-School Special Education in 1998, at the age of three. *Id.*

J.B. attended first grade at a DOE public school, receiving related services through the DOE,

---

[2] Unless otherwise noted, all citations to exhibits refer to those documents marked as exhibits during the impartial hearing on this matter held between April and June 2012, *see infra* Section I.C.2., and included in the certified copy of the administrative record provided to the Court.

including speech and language therapy and occupational therapy ("OT"). *Id.* Beginning in

second grade, he was enrolled for several years at the School for Language and Communication

Development, a special private school designed for students with language difficulties, where he

continued to receive related services. *Id.* at 3. At the age of eight, J.B. was diagnosed with

Attention Deficit Hyperactivity Disorder. *Id.* In 2005, the Parents rejected J.B.'s DOE-

recommended placement at the Hallen School, a state-approved special education school in

Westchester, New York, and instead placed him at one of Cooke's school sites. *Id.* J.B.

remained at Cooke, and transitioned to one of its middle school sites in September 2008. *Id.*

During the 2009-2010 school year, J.B. attended ninth grade at a Cooke facility. *See*

Impartial Hearing Transcript ("Tr.") at 161, 255; DOE Ex. 9 (Cooke Progress Report, dated

November 2009) at 1. At the time, J.B. presented with cognitive deficits across multiple

domains. Tr. at 256. He had particular difficulties with, among other things, working memory,

speech and language processing, verbal and perceptual reasoning, verbal and reading

comprehension, and problem-solving, and he reflected multi-year delays in his general academic

development, pragmatic language usage, and social-emotional functioning. *Id.* at 256-57, 276-

77, 310; DOE Ex. 7 (Psycho-Educational Evaluation, dated February 26, 2008) at 5. J.B.'s IEP

for the 2009-10 school year noted that J.B. "present[ed] with cognitive delays, academic delays,

and speech-language processing delays which preclude[d] participation in the general education

environment," and recommended that he be placed in a community high school within a special

class with a 15:1 student-teacher ratio because "anything less restrictive would be inappropriate"

to address his academic functioning. Parents' Ex. D (2009-10 IEP) at 1, 20-22. It further

recommended that J.B. receive several related services, including counseling (one forty-minute

session per week in a group of three); OT (one forty-minute session per week in a group of two);

one-on-one speech and language therapy (one forty-minute session per week); and group-based speech and language therapy (one forty-minute session per week). *Id.* at 22. The IEP also recommended that J.B. participate in the DOE's regular-length school year rather than in a twelve-month school year. *Id.* at 1.

### 1.    January 28, 2010 CSE Meeting and 2010-11 IEP

Pursuant to a Notice of IEP Meeting dated December 22, 2009, a CSE convened on January 28, 2010 to conduct J.B.'s annual review and develop an IEP for the 2010-11 school year, during which J.B. would turn sixteen. *See* DOE Ex. 5 (Notice of IEP Meeting) at 1; DOE Ex. 3 (2010-11 IEP) at 1-2; Tr. at 159. The meeting was chaired by Jacqueline Giurato, a special education teacher who also served as the CSE's district representative. Tr. at 160. Also present were Nancy Levine, a school psychologist; Gloria Gonzales, who served as the CSE's parent member; and J.B.'s mother, L.B. *Id.* at 160, 481; DOE Ex. 3 (IEP) at 2; DOE Ex. 4 (CSE Meeting Minutes) at 1. Francis Tabone, the Assistant Head of Cooke, and Ilana Prusock, J.B.'s then-current math teacher at Cooke, participated in the meeting by phone, although Prusock departed following the CSE's discussion of J.B.'s performance in math. Tr. at 159-60, 269-70, 466-67; DOE Ex. 3 (IEP) at 2; DOE Ex. 4 (CSE Meeting Minutes) at 1. Both J.B. himself and other members of the Cooke staff were invited to the meeting but did not attend. DOE Ex. 5 (Notice of IEP Meeting) at 1; Tr. at 213.

The team had the following reference materials at the CSE meeting: J.B.'s IEP from the previous school year; a classroom observation completed by Levine on November 10, 2009; a November 2009 triannual Cooke Progress Report covering approximately twelve different academic and practical subjects; a Psycho-Educational Evaluation of J.B., dated February 26, 2008; and a Social History Update, dated April 21, 2009. Tr. at 164-65; *see also* DOE Exs. 7-10.

Further information on J.B.'s performance levels, recent test results, then-current goals, and support and management needs was provided by Prusock with respect to math and by Tabone – who regularly conferred with J.B.'s teachers – with respect to other areas. Tr. at 168-74, 195-97, 201-02, 281-83; DOE Ex. 4 (CSE Meeting Minutes) at 1. The DOE did not affirmatively provide the Cooke personnel participating telephonically with copies of the CSE's reference materials, Tr. at 192-93, and provided L.B., to the best of her recollection, only with a copy of the classroom observation in advance of the meeting, Tr. at 481.

At the start of the CSE meeting, the team solicited any specific concerns from L.B. DOE Ex. 4 (CSE Meeting Minutes) at 1. It then proceeded to a discussion of J.B.'s current levels of performance and functionality, and his specific academic deficits. *Id;* Tr. at 166-67, 171-72. The CSE received information on these matters largely from Prusock and Tabone, who reported on recent test results, teacher observations, and teacher estimates. Tr. at 166-73, 177-79, 195-97. It also relied on the November 2009 Cooke Progress Report. *Id.* at 194. According to Giurato, the team relied on these sources in part "[b]ecause the teacher knows the student best and this is where the teacher felt the student was performing at that time." *Id.* at 170. The CSE determined that J.B. was "below grade level in all areas of academic functioning," DOE Ex. 3 (IEP) at 5, and was "functioning on a high-first grade to low-second grade level in math," with English language arts skills "on a first grade level for reading comprehension" and "vocabulary skills . . . assessed to be on a second grade level," *id.* at 3. It found that he had demonstrated needs in a variety of specific areas, including: reading comprehension; written expression; reading and writing whole numbers and identifying place values; social use of language, active listening, conversation skills, and overall intelligibility; visual motor skills; use of maps and navigation of the school building; and others. DOE Ex. 3 (IEP) at 5. It further concluded that, despite these

challenges, J.B. "worke[d] very hard in school"; "always participate[d] in class discussions"; "complete[d] homework and follow[ed] directions and rules"; and was a "social butterfly" who "relate[d] well to his peers." *Id.* at 6; DOE Ex. 4 (CSE Meeting Minutes) at 1.

The CSE then proceeded to develop annual goals and short-term objectives for J.B. to pursue during the 2010-11 school year. It ultimately generated at least nine annual goals – supported by approximately thirty-eight short-term objectives – covering math, English language arts, listening comprehension, written expression, speech and language, transition, OT, and counseling. DOE Ex. 3 (IEP) at 8-12. In developing these goals and objectives, the CSE reviewed J.B.'s then-current goals and anticipated goals as reported by Prusock and Tabone and as reflected on the Cooke Progress Report, and then either "expanded" on J.B.'s then-current goals "moving forward" or substantially retained the current goals, depending on whether it appeared that J.B. would "master" them by the start of the 2010-11 school year. Tr. at 171-73, 182, 200-04, 212-15. To help J.B. achieve the goals, the CSE drafted a set of academic management tools and strategies, including the "use of graphic organizer[s]/charts/checklists," "teacher guidance through questioning and modeling," "visual and verbal prompts," "small group instruction," and the assignment of "tasks broken down into small, sequential steps." DOE Ex. 3 (IEP) at 3.

The CSE then reviewed the slate of related services that J.B. was currently receiving at Cooke and recommended certain modifications, including terminating J.B.'s one-on-one speech and language therapy and concomitantly increasing his group-based speech and language therapy to two forty-five minute sessions per week. DOE Ex. 3 (IEP) at 15; DOE Ex. 4 (CSE Meeting Minutes) at 2. It otherwise recommended that such services should be continued in their present form. DOE Ex. 3 (IEP) at 15. In light of J.B.'s age, the CSE also discussed a post-secondary

8

school transition program for J.B., and drafted a set of desired long-term adult outcomes and transition services to be provided during the school year. DOE Ex. 3 (IEP) at 16-17; DOE Ex. 4 (CSE Meeting Minutes) at 2; Tr. at 188-89.

The CSE then considered the 15:1 student-teacher ratio contemplated by the program recommendation in J.B.'s previous IEP. Tr. at 189-90. Based on the foregoing discussions and after a conversation with L.B. regarding available program options, the CSE concluded that a 15:1 class would not be "sufficient to meet [J.B.'s] significant academic and cognitive delays" and recommended that J.B. instead be placed in a specialized school in a special classroom with a 12:1:1 ratio of students-teacher-paraprofessional. DOE Ex. 3 (IEP) at 1, 14; Tr. at 164, 189-90; DOE Ex. 4 (CSE Meeting Minutes) at 2. It further recommended that J.B. participate in a twelve-month school year and in the DOE's Alternate Assessment program. DOE Ex. 3 (IEP) at 1, 15 Tr. at 164.

Finally, the CSE discussed the possibility of modifying J.B.'s classification from speech and language-impaired to learning disabled. Tr. at 190-91; DOE Ex. 4 (CSE Meeting Minutes) at 2. After L.B. indicated that she felt "more comfortable" with the former classification, the CSE agreed to retain J.B.'s classification unchanged. Tr. at 191; DOE Ex. 4 (CSE Meeting Minutes) at 2.

L.B. participated actively in the CSE meeting. She shared thoughts about J.B.'s capacity to deal with "new material" and about the impact of certain recent health problems on his ability to participate in physical activities. DOE Ex. 4 (CSE Meeting Minutes) at 1. She discussed available scholastic program options with the other members of the CSE, *id.* at 2, and later testified that, despite some confusion during the meeting about terminology, she preferred the 12:1:1 student-teacher-paraprofessional classroom ratio recommended by the CSE at least over

9

the 15:1 student-teacher ratio recommended in the prior year's IEP. Tr. at 165-66; 500-01.[3] As noted above, L.B. weighed in decisively on the issue of J.B.'s classification after the CSE raised the possibility of a modification. DOE Ex. 4 (CSE Meeting Minutes) at 2; Tr. at 190-91. Neither L.B. nor the Cooke personnel raised objection to any goals set forth in the IEP or proposed any specific goals that were not ultimately included. Tr. at 187-88, 501-02. They also declined to request any additional evaluations of J.B. or consultation with service providers not present at the meeting. Tr. at 213.

### 2. DOE's Recommended School Placement and Parents' Rejection and Unilateral Placement at Cooke

By letter dated June 10, 2010, the DOE advised the Parents that J.B.'s IEP team had recommended that he be placed at PS721M Occupational Training Center ("PS721M"), a school in Manhattan designed for students with special needs, for the 2010-11 school year. DOE Ex. 6 (Final Notice of Recommendation) at 1; Tr. at 31. The Parents subsequently visited PS721M, meeting with a senior administrator, receiving a guided tour, and observing an active session of a class of first-year high school students that was presented as "similar" to a class to which J.B. could be assigned. Tr. at 486-87, 496-99. Following that visit, L.B. wrote to the DOE to inform it of the Parents' view that J.B.'s enrollment at PS721M would "not be appropriate." Parents' Ex. C (Letter from L.B. to DOE) at 1. In her letter, dated June 24, 2010, L.B. cited several reasons for the Parents' conclusion: (i) the "massive size of the school would overwhelm [J.B.]"; (ii) the "wide range of needs of the aggregate class [would] not afford [J.B.] enough individual

---

[3] L.B. testified that, during the CSE meeting, she believed that the definition of the term "12:1:1," as used by the DOE, comported with Cooke's definition, which called for one teacher and one assistant teacher rather than for one teacher and one paraprofessional. Tr. At 482, 495. As discussed further below, the Parents now argue that a 12:1:1 classroom with one teacher and one paraprofessional was an inappropriate placement for J.B. Tr. At 482-83.

attention"; (iii) the "departmentalized structure [would be] a regression from the more traditional

high school program that [J.B. had] experienced, that required class changes for each course,"

and had "improved his ability to plan and transition"; and (iv) there were "no openings

presently" at PS721M. *Id.* The final point was based, according to L.B., on a comment made by

her tour guide at PS721M to the effect that "generally . . . there were no openings" at the school

at the time of the tour. Tr. at 486-87, 502-03. L.B.'s June 24 letter concluded by explicitly

advising the DOE that J.B. would "attend [Cooke] for his instruction and related services" during

the 2010-11 school year." Parents' Ex. C (L.B.'s Letter to DOE) at 1.

    L.B. submitted her letter via fax to the contact person listed on the DOE's Final Notice of

Recommendation on June 25, 2010. Tr. at 487-88. After receiving no response, she resubmitted

the letter on August 16, 2010. *Id.* Again, there was no response from the DOE. *Id.* at 488-89.

J.B. did not attempt to call the DOE or otherwise follow up on her letter, and she did not speak

further with any personnel from PS721M. *Id.* at 503-04.

    The Parents did in fact unilaterally enroll J.B. at Cooke for the 2010-11 school year,

although they declined enrollment in Cooke's 2010 summer program – instead enrolling J.B. in

"a mainstream setting" at the Harlem School of the Arts for the summer – notwithstanding the

IEP's recommendation that J.B. participate in a twelve-month school year. Tr. at 489-91. The

Parents executed a contract obligating them to pay Cooke's tuition for the 2010-11 school year

on September 6, 2010. Parents' Ex. I (Cooke Enrollment Contract) at 2; Tr. at 492.

## C.    Procedural Background

### 1.    The February 9, 2012 Due Process Complaint

On February 9, 2012, the Parents filed a due process complaint seeking reimbursement

for J.B.'s Cooke tuition and requesting an impartial hearing (the "Due Process Complaint" or

"DPC"). *See* Parents' Ex. A (Due Process Complaint) at 1-5. As the basis for the requested relief, the Due Process Complaint set forth a variety of purported procedural and substantive deficiencies reflected in J.B.'s IEP and the CSE meeting at which it was developed.

Addressing the IEP development procedure, the DPC alleged, among other things, that the CSE team was "invalidly constituted," "failed to evaluate [J.B.] in all areas of suspected disability," "failed to consider sufficient, current and appropriate evaluative and documentary material to justify its recommendations and goals," and failed to provide both L.B. and J.B.'s then-current teachers "with a meaningful opportunity to participate in the decision-making process," including by not providing copies of the relevant evaluative materials prior to the meeting or reading such materials aloud for the benefit of all meeting participants. *Id.* at 1-2.

As to the substance of the IEP, the DPC alleged that the IEP's description of J.B.'s then-present performance inadequately specified the basis for the functional levels provided and failed to adequately describe the extent of several of J.B.'s deficits, including in expressive and receptive language, attention and organization, and motor skills. *Id.* at 2. The DPC also alleged that the "goals specified in the IEP are too few and too generic to appropriately address [J.B.'s] needs and to allow him to make measureable . . . progress and avoid regression." *Id.* at 2-3. Furthermore, according to the DPC, the "outcomes and services specified" in the transition plan included in the IEP were "vague and generic," rendering the plan "insufficient to address [J.B.'s] needs for successful transition to post-secondary education and independent living." *Id.* at 3. The Due Process Complaint also challenged the recommendation of a special 12:1:1 classroom in a specialized school, asserting that the CSE initiated this change to "a more restrictive . . . environment" from the 15:1 community school program recommended in J.B.'s preceding IEP "without providing sufficient explanation to [L.B.] for the reason for this change" and that the

IEP failed to include "an appropriate transition plan or supports to assist [J.B.] to transition

successfully" to a 12:1:1 setting even though it was "significantly larger" than his then-current

setting at Cooke. *Id.* at 2-3. Finally, the DPC attacked the recommended placement at PS721M,

citing several of the same concerns articulated in L.B.'s June 24, 2010 letter among other

purported deficiencies. *Id.* at 3.

### 2.    Impartial Hearing and IHO Decision

The IHO presided over a prehearing conference on March 21, 2012 followed by an

impartial hearing consisting of five non-consecutive days of testimony, evidentiary submissions,

and other proceedings between April 5, 2012 and June 1, 2012. IHO Decision No. 137794 (Jul.

26, 2012) (the "IHO Decision") at 3. On July 26, 2012, the IHO issued a decision concluding

(i) that the DOE failed to offer J.B. a FAPE for the 2010-11 school year, (ii) that the Parents had

established that their unilateral placement of J.B. at Cooke was appropriate, and (iii) that

equitable considerations favored reimbursement of the tuition that the Parents paid to Cooke.

IHO Decision at 12-14.

With respect to the denial of a FAPE, the IHO found that the DOE "prepared many of the

goals" set forth in the IEP "without adequately calculating whether [the 2009-10] teacher reports

would be sufficiently current information to form the basis of an IEP for the 2010-2011 school

year." IHO Decision at 11. The IHO further found that the "speech goals [included in the IEP]

are not sufficient," citing the testimony of Cooke's speech therapist who opined that such goals

over-emphasized objectives related to articulation, which "is not an important area for [J.B.] to

focus on in regard to speech and language therapy." *Id.* at 11-12. The IHO also concluded that

the transition plan included in J.B.'s IEP largely was "vague and generic" and lacking in

"meaningful detail." *Id.* at 12. Finally, the IHO found that the DOE failed to meet its burden of

13

persuasion that PS721M would have been able to appropriately implement J.B.'s IEP in response to the Parents' challenges to the recommended placement. *Id.* at 9-10. It noted in this regard that the DOE "did not call any witness that testified specifically about [J.B.'s] proposed program at [PS721M] for the 2010-11 school year," that the DOE's witnesses focused on the DOE's summer program at PS721M, and that the witnesses "did not clearly address the issue of the availability of the setting for [J.B.], although [L.B.] testified that she was told that the setting was not available for [J.B.] when visited the school on a school tour." *Id.* at 9-10. The IHO did not make any explicit findings or reach explicit conclusions of law with respect to several of the Parents' specific challenges to the IEP development process, including their meaningful participation claim.

### 3.    SRO Decision

On August 28, 2012, the DOE appealed the IHO Decision to an SRO. *See* Notice with Petition, SRO Case No. 12-171 (Aug. 28, 2012). The Parents responded to the DOE's petition on September 24, 2012. *See* Verified Answer and Cross-Appeal, Appeal No. 12-171 (Sept. 24, 2012). Although styled in part as a "cross-appeal," the Parents' response did not articulate any specific findings, conclusions, or failures to decide of which the Parents sought appellate review. The DOE answered on October 26, 2012, noting the Parents' lack of specificity as to the issues they purported to appeal and responding only "to the extent that [the Parents] raised new arguments in the Cross-Appeal that ha[d] not been previously addressed." Verified Answer to Cross-Appeal, Appeal No. 12-171 (Oct. 26, 2012) at 3.

In a decision issued on December 22, 2014, the SRO sustained the DOE's appeal, dismissed the Parents' cross-appeal, and reversed the IHO Decision, denying the Parents' request for tuition reimbursement. *Application of the DOE*, Appeal No. 12-171 (Dec. 22, 2014) (the

14

"SRO Decision") at 21.  With regard to CSE process, the SRO concluded that the "January 2010

CSE reviewed a variety of sources to ascertain information about [J.B.'s] cognitive ability and

academic, language, and social skills needs" and "had sufficient evaluative information to

develop the January 2010 IEP."  SRO Decision at 10-11.

Concerning the substance of the IEP, the SRO first found that the "CSE had sufficient

information relative to the student's present levels of academic achievement and functional

performance – including the teacher reports and estimates of the student's current skill levels – at

the time of the January 2010 CSE meeting to develop an IEP that accurately identified and

reflected [J.B.'s] special education needs."  *Id.* at 13.  The SRO further concluded that the annual

goals set forth in the IEP "appropriately targeted" J.B.'s speech and language needs – including

by focusing on receptive and pragmatic language – and also "addressed . . . his needs pertaining

to reading and listening comprehension and written expression."  *Id.* at 14-15.  The SRO also

found that "the evidence . . . supports a finding that the 12:1+1 special class placement at a

specialized school was appropriate to meet [J.B.]'s special education needs," and that the

transition plan included in the IEP, "while sparse and technically deficient," did not "impede[]

the student's right to a FAPE, significantly impede[] the [P]arents' opportunity to participate in

the decision-making process regarding the provision of a FAPE to the student, or cause a

deprivation of education benefits."  *Id.* at 16-18.

Regarding the recommended placement, the SRO concluded that the Parents' challenges

to PS721M's ability to implement and adhere to J.B.'s IEP were impermissibly speculative given

their decision to "reject the assigned public school site" unilaterally and "instead . . . enroll the

student in a nonpublic school of their choosing prior to the time the district became obligated to

implement that January 2010 IEP."  *Id.* at 18-19 (also observing that "[g]enerally, the sufficiency

15

of the district's offered program must be determined on the basis of the IEP itself" and that "a retrospective analysis of how the district would have implemented the student's IEP at the assigned public school site is not an appropriate inquiry under the circumstances of this case"). Finally, the SRO substantially declined to consider the Parents' Cross-Appeal, including as to any issues that the IHO may have erroneously failed to decide. Specifically, it noted that, as the Parents' "answer and cross-appeal lack[ed] any guidance from the [P]arents' counsel indicating what matters the [P]arents are cross-appealing or at least citations to the relevant portions of the hearing record," the SRO would not "sift through their [D]ue [P]rocess [C]omplaint notice, the hearing record, and IHO [D]ecision for the purposes of asserting claims on their behalf." *Id.* at 5 n.3.

The Parents initiated the instant action in this Court on April 22, 2015. Dkt. No. 1.

## II.    Standard of Review

A summary judgment motion in the context of an IDEA action involves "more than looking into disputed issues of fact." *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (*per curiam*); *see also C.W.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 461 (S.D.N.Y. 2015) ("Unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion [in an IDEA action]"). Such a motion functions as a "pragmatic procedural mechanism for reviewing administrative decisions." *M.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013) (internal quotation marks omitted). The Court conducts an "'independent' judicial review" of the record, and "fashion[s] appropriate relief based on its assessment of a preponderance of the evidence developed at the administrative proceedings." *Walczak*, 142 F.3d at 122-23, 129 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205 (1982)). The Supreme

16

Court has cautioned, however, that such review is not an "invitation . . . to substitute" the Court's "own notions of sound educational policy for those of the school authorities." *Rowley*, 458 U.S. at 206.  Accordingly, while courts may not "simply rubber stamp administrative decisions," *R.E.*, 694 F.3d at 184 (internal quotation marks omitted), they are required to "give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotations marks and brackets omitted); *see also M.H.*, 685 F.3d at 244 ("the district court's determination of the persuasiveness of an administrative finding must . . . be colored by an acute awareness of institutional competence and role").

Under this "due weight" standard, "the deference owed to an SRO's decision depends on the quality of that opinion." *R.E.*, 694 F.3d 189.  "[F]amiliar bright-line standards such as clear error and *de novo* review do not apply." *N.M.*, 2016 WL 796857, at \*4.  Rather, the level of deference afforded the administrative officer's decision "hinge[s] on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244; *see also T.K.*, 810 F.3d at 875 (particular deference should be given to state proceedings where "the state hearing officers' review has been thorough and careful") (internal quotation marks omitted).  "By way of illustration," the Court of Appeals has explained:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than

17

determinations concerning whether there have been objective
indications of progress. Determinations grounded in thorough and
logical reasoning should be provided more deference than decisions
that are not. And the district court should afford more deference
when its review is based on entirely the same evidence as that before
the SRO than when the district court has before it additional
evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244. (internal citations omitted).

"When the conclusion of an IHO and SRO differ, the Court must accept the

determination of the SRO as the decision entitled to deference 'unless it concludes that the SRO

decision was inadequately reasoned.'" *R.B.*, 2016 WL 2939167, at *3 (brackets omitted)

(quoting *R.E.*, 694 F.3d at 189)). That is, "reviewing courts are generally 'not entitled to adopt

the conclusions of either state reviewer according to their own policy preferences or views of the

evidence' but 'must defer to the reasoned conclusions of the SRO as the final state administrative

determination.'" *N.M.*, 2016 WL 796857, at *4 (quoting *M.H.*, 685 F.3d at 246). If, however,

the "SRO's determinations are insufficiently reasoned to merit that deference, and in particular

where the SRO rejects a more thorough and carefully considered decision of an IHO, it is

entirely appropriate for the court . . . to consider the IHO's analysis, which is also informed by

greater educational expertise than that of judges, rather than to rely exclusively on its own less

informed educational judgment." *M.H.*, 685 F.3d at 246.

"When a state's decision under the IDEA is challenged in federal court, the court

conducts a review of both the procedural and substantive adequacy of the underlying decision."

*N.M.*, 2016 WL 796857, at *4 (internal quotation marks and brackets omitted). First, the court

"examine[s] whether . . . the state has complied with the procedures set forth in the IDEA." *R.E.*,

694 F.3d at 190 (internal quotation marks omitted). Second, it "examine[s] whether the IEP was

substantively adequate, namely, whether it was reasonably calculated to enable the child to

receive educational benefits." *Id.* (internal quotation marks and brackets omitted).

## III.   Discussion

Plaintiffs' case before this Court is based on many of the same premises described above. Plaintiffs argues that the 2010-11 IEP was both procedurally and substantively deficient and that the recommended placement at PS721M was inappropriate, as the DOE would have been unable to implement the IEP in that setting.

### A.   Adequacy of the IEP

As noted, to determine the adequacy of an IEP, courts engage in a two-part inquiry. The first prong asks "whether the state has complied with the procedures set forth in the IDEA," *R.E.*, 694 F.3d at 190 (internal quotation marks omitted), and, if not, whether violations of those procedures impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits, 20 U.S.C. § 1415(f)(3)(E)(ii). The second prong asks whether, from a substantive perspective, the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. "[A] school district is not required to provide 'every special service necessary to maximize each handicapped child's potential,'" *C.W.L.*, 149 F. Supp. 3d at 464 (quoting *Rowley*, 458 U.S. at 199), but need only provide an "IEP that is likely to produce progress, not regression" and that "affords the student with opportunity greater than mere trivial advancement," *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). When, as here, an SRO concluded that IEP was adequate, "the courts are bound to exhibit deference to that decision, [and] the burden of demonstrating that the SRO erred is properly understood to fall on the plaintiff." *Reyes v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (internal quotation marks, brackets, and ellipses omitted); *see also M.H.*, 685 F.3d

19

at 225 n.3; *A.D. v. N.Y.C. Dep't of Educ.*, 12-cv-2673, 2013 WL 1155570, at *5 (S.D.N.Y. Mar.

19, 2013).

As a preliminary matter, the SRO applied the appropriate standard of review to the IHO

Decision. Although Plaintiffs suggest that the SRO "improperly afforded the IHO no measure of

deference,"[4] both the IDEA and relevant New York statue provide, in substance, that "an SRO's

review of an IHO decision is *de novo*." *M.W.*, 869 F. Supp. at 329; *see also* 20 U.S.C. §

1415(g)(2) ("The officer conducting such review shall make an *independent decision* upon

completion of such review") (emphasis added); N.Y. Educ. Law § 4404(2) (SRO "shall review

and may modify . . . *to the extent that the review officer deems necessary*, in order to effectuate

the purposes of this article, *any determination of the impartial hearing officer*") (emphasis

added). Moreover, the Court's review of the decisions reveals no instance of, for example, the

SRO disregarding some factual finding or credibility judgment that the IHO was better

positioned to make. Rather, it appears to the Court that the SRO, "relying on substantially

similar facts as did the IHO . . . drew differing legal conclusions" – a decision squarely within

its authority. *R.R. v. Scarsdale Union Free Sch. Dist.*, 366 Fed. App'x 239, 242 (2d Cir. 2010)

(Summary Order). Accordingly, the Court, faced with the same record presented to the SRO,

will defer to the SRO Decision to the extent that the Court finds that Decision "well-reasoned,"

"careful," and "thorough." *See supra* Section II.

### 1.    The IEP Was Devised in a Procedurally Sound Manner that Did Not Deny J.B. a FAPE

The Parents raise three principal procedural challenges to J.B.'s IEP. First, they contend

that the CSE failed to consider sufficient evaluative and documentary material to justify the goals

---

[4] *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 17 ("Pls. Br."), at 10.

and recommendations set forth in the IEP, particular insofar as the CSE relied largely on the November 2009 Cooke Progress Report and on reports from Tabone and Prusock as to what J.B. was working on as of late 2009 and early 2010 to develop goals for the 2010-11 school year. Pls. Br. at 11-12. Second, they argue that the CSE failed to afford the Parents and Cooke personnel a meaningful opportunity to participate in the CSE meeting. *Id.* at 12-15. Third, they attack the post-secondary transition plan included in the IEP as impermissibly devoid of individual tailoring and detail.[5] *Id.* at 17-18.

The IHO agreed with the Parents that the DOE "prepared many of the goals without adequately calculating whether [the] teacher reports would be sufficiently current information to form the basis of an IEP for 2010-2011," and that elements of the transition plan were inappropriately "vague and generic." IHO Decision at 11-12. The IHO did not, however, address the Parents' meaningful participation claim. The SRO also declined to address the meaningful participation claim, but disagreed with the IHO as to the sufficiency of the evaluative materials considered and the impact of the concededly vague transition plan on the DOE's provision of a FAPE. SRO Decision at 8-11, 16-18. As explained further below, the Court agrees with the conclusions of the SRO as to the evaluative materials and the transition plan and concludes upon a *de novo* review of the Parents' meaningful participation claim that the CSE afforded the Parents and Cooke staff with a sufficient opportunity to participate meaningfully in the development of J.B.'s IEP.

---

[5] While the Parents include their arguments regarding the transition plan in the portion of their brief addressing the substantive adequacy of the IEP, courts in this District have construed challenges to post-secondary transition plans to be procedural in nature. *See, e.g., M.Z. v. N.Y.C. Dep't of Educ.*, 12-cv-4111, 2013 WL 1314992, at *9 (S.D.N.Y. Mar. 21, 2013) (noting that "a deficient transition plan is a procedural flaw").

a.    **Evaluative Materials**

"The IDEA requires those formulating a student's IEP to 'review existing evaluation data

on the child, including (i) evaluations and information provided by the parents of the child;

(ii) current classroom-based, local, or State assessments, and classroom-based observations; and

(iii) observations by teachers and related services providers . . . .'" *F.B. v. N.Y.C. Dep't of*

*Educ.*, 923 F. Supp. 2d 570, 581-82 (S.D.N.Y. 2013) (quoting 20 U.S.C. § 1414(c)(1)(A))

(ellipsis in original).  "It does not require that the team review every single item of data

available, nor has case law interpreted it to mean such." *Id.* at 582.

The SRO concluded based on Giurato's testimony during the impartial hearing and

comparisons of the relevant materials to the 2010-11 IEP, that "to develop the January 2010

IEP," the "CSE considered and relied upon": (i) the February 2008 Psycho-Educational

Evaluation; (ii) the April 2009 Social History Update; (iii) the November 2009 Cooke Progress

Report; (iv) the November 2009 Classroom Observation; and (v) J.B.'s 2009-10 IEP.  SRO

Decision at 8; *see also id.* at 10-13.  As the DOE correctly notes,[6] the November 2009 Cooke

Progress Report included sub-reports from J.B.'s travel training instructors, independent living

instructor, language skills instructors, and occupational therapist, in addition to those from his

academic teachers.  DOE Ex. 9 (November 2009 Cooke Progress Report) at 2-15.  The SRO

further found that the "CSE also relied upon information provided by Cooke staff attending the

meeting," which "provided the CSE with the results of a September 2009 administration of both

the [Group Mathematics Assessment and Diagnostic Evaluation] and [Group Reading

Assessment and Diagnostic Evaluation]" and with insights into J.B.'s current functionality levels

---

[6] *See* Defendant's Memorandum of Law in Support of Its Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, Dkt. No. 21 ("Def. Br."), at 21.

in several academic areas.  SRO Decision at 8, 10.  The SRO concluded, based on the foregoing,

that the January 2010 CSE appropriately "reviewed a variety of sources to ascertain information

about the student's cognitive ability and academic, language, and social skills needs, and

formulated the January 2010 IEP based upon this information," which it deemed "sufficient"

evaluative material.  SRO Decision at 10-11.

The Court sees no basis to disturb the SRO's determination.  There is no evidence in the

record that any more recent or comprehensive evaluations or reports were available for the

CSE's review, suggesting that the CSE relied on the most accurate and up-to-date information at

its disposal to ascertain J.B.'s educational strengths, challenges, and needs.  Nor do Plaintiffs

point to any specific evaluation or report from some additional source – such as an independent

specialist – that the CSE declined to consider.  Courts in this District have consistently deemed

sets of materials similar to the one at issue here sufficient bases for IEP development, and the

Court is satisfied that such conclusions apply with equal force here.  *See, e.g., C.W. v. City Sch.*

*Dist. of the City of N.Y.*, 15-cv-3214, 2016 WL 1230794, at *4 (S.D.N.Y. Mar. 22, 2016) (July

2010 psycho-educational evaluation, November 2010 DOE student observation, March 2011

Cooke progress report, prior-year IEP, and verbal reports from then-current teachers were

sufficient basis for 2011-12 IEP).[7]

Resisting this conclusion, the Parents counter that the SRO erred because there is in fact

---

[7]*See also D.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 330 (S.D.N.Y. 2013) (information and estimates from student's then-current teachers and service providers, previous year's IEP, and OT, mental health, and private school progress reports from early-mid 2010 sufficient bases for 2010-11 IEP); *M.Z. v. N.Y.C. Dep't of Educ.*, 12-cv-4111, 2013 WL 1314992, at *8 (S.D.N.Y. Mar. 21, 2013) (2009-10 private school reports on speech and language, OT, physical therapy, academics, and transition training, coupled with input from private school representatives who worked with student, sufficient bases for 2010-11 IEP); *J.F. v. N.Y.C. Dep't of Educ.*, 12-cv-2184, 2012 WL 5984915, *2, 7 (S.D.N.Y. Nov. 27, 2012) (early 2009 and mid-2010 private school progress and performance reports along with 2009 social history, psychological development, neurodevelopmental reports, and 2010 classroom observation and related services reports sufficient for June 2010 CSE meeting).

no evidence in the record that the CSE *actually "reviewed or discussed"* anything other than the
Cooke Progress Report and teacher evaluations during the January 2010 meeting because
Giurato's testimony reflects only that the team *had access to* the additional materials described
above during the meeting. Pls. Br. at 12; Plaintiffs' Reply Memorandum of Law in Support of
Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary
Judgment, Dkt. No. 23 ("Pls. Reply"), at 3-4. Regardless of one's characterization of Giurato's
testimony, the IEP – as the SRO correctly observed – clearly incorporates information from, and
addresses issues reflected in, examples of the other evaluative materials available to the CSE.
*See* SRO Decision at 12-13 (citing examples). Several of the academic management needs listed
in the IEP, for example, reflected notations in Levine's November 2009 Classroom Observation
and in the 2008 Psycho-Educational Evaluation, including that J.B. struggled to process complex
verbally presented information, responded positively to regular visual and verbal prompts,
required teacher guidance through questioning, modeling, and repetition, and benefited from
having tasks broken down into small, sequential steps. *Compare* DOE Ex. 3 (IEP) at 3, 5 *with*
DOE Ex. 10 (Classroom Observation) at 1 *and* DOE Ex. 7 (Psycho-Educational Evaluation) at 1,
2, 6. Several goals included in the IEP, moreover, addressed J.B.'s deficiencies in social
reasoning, practical problem-solving, and sense of self-worth as set forth in the Social History
Update and Psycho-Educational Evaluation. *Compare* DOE Ex. 3 (IEP) at 12 *with* DOE Ex. 8
(Social History Update) at 4 *and* DOE. Ex. 7 (Psycho-Educational Evaluation) at 6. Other goals
appear to have targeted specific deficiencies in reading comprehension – difficulties responding
to "story questions," for example – documented in the Psycho-Educational Evaluation. *Compare*
DOE Ex. 3 (IEP) at 9 *with* DOE Ex. 7 (Psycho-Educational Evaluation) at 3. In light of this
substantive alignment between the IEP and the documents cited in Giurato's testimony, the

24

CSE's review and integration of a variety of appropriate evaluative materials is evident to the Court.[8] *See, e.g., C.W.*, 2016 WL 1230794, at *4 (even where certain evaluation was not "specifically referenced in the IEP," IEP "provided a description of the student's unique profile of strengths and needs . . . that is aligned with the information") (internal quotation marks omitted).

What is more, even assuming that the CSE relied *primarily* on Cooke teacher estimates, assessments, and progress reports in developing the IEP, such focus would not support a finding of procedural error under the circumstances presented. The record reflects that, with J.B. attending Cooke during the 2009-10 school year, these sources likely provided the most current information available on J.B.'s academic performance and scholastic functionality, and it is therefore reasonable that they would serve as primary bases for the development of the IEP. *See, e.g., N.M.*, 2016 WL 796857, at *5 (no procedural error where CSE "relied primarily" on Cooke progress report while also considering "information derived from a number of sources, including the student's physician [and] previous evaluations," and receiving input from Cooke personnel); *see also* Tr. at 170 (Giurato testifying that the CSE relied on teacher observations and estimates "[b]ecause the teacher knows the student best" and could effectively report on his then-current performance); *id.* at 173, 182 (Giurato testifying that CSE received information regarding J.B.'s then-current work and "expanded it moving forward"). It is especially sensible that the 2010-11 IEP would reflect continuity with J.B.'s needs and objectives as of late 2009 and early 2010,

---

[8] It also bears noting that the CSE undisputedly relied upon J.B.'s then-operative IEP (i.e., his 2009-10 IEP) in developing the IEP for the following year, as it necessarily had to do when considering modifications to the program and related services recommendations. The earlier IEP, in turn, expressly incorporated information from such sources as the 2008 Psycho-Educational Evaluation and the 2009 Social History Update and set forth several of the primary conclusions detailed in those documents. Parents' Ex. D (2009-10 IEP) at 3-6.

given that he had been "functioning on . . . between a second and first grade level for several years." Tr. at 202; IHO Decision at 5. *See, e.g., J.C.S.*, 2012 WL 3975942, at *11-12 ("in light of [the student's] academic needs remaining substantially the same," goals from prior school years "were still consistent" with those needs and "similarity" of goals across two IEPs "ma[de] sense") (internal quotation marks omitted); *see also* Parents' Ex. D (2009-10 IEP) at 4 (reflecting academic performance largely at second grade level during the prior school year).

Finally, to the extent that the Parents suggest, in passing, that the CSE should have ordered additional evaluations or testing of J.B., Pls. Br. at 11, the Court notes, as did the SRO, that the District was under no obligation to conduct a formal triennial reevaluation at the time of January 2010 CSE meeting, and neither the Parents nor any other CSE member requested additional evaluations during the course of the meeting. SRO Decision at 11; Tr. at 213; *see also* 34 § CFR 300.303(b)(1)-(2); 8 N.Y.C.R.R. § 200.4(b)(4) (setting forth federal and state triennial reevaluation requirements, respectively). Especially given that the CSE had the benefit of wide-ranging progress reports, test results, teacher observations, and social work reports from the approximately eight months preceding the IEP as well as a psycho-educational evaluation from the previous school year, the Court concludes that no additional evaluations or tests were necessary to render the IEP development process procedurally compliant. *See, e.g., D.J. v. N.Y.C. Dep't of Educ.*, 12-cv-7009, 2013 WL 4400689, at *4 (S.D.N.Y. Aug. 15, 2013) ("The IDEA . . . does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP, particularly where, as here, the student had already been subject to recent evaluations.") (internal quotation marks omitted); *M.Z.*, 2013 WL 1314992, *8 ("Given the quantity and quality of the evaluative information it considered, the CSE was authorized to decide that no further evaluations were needed.") (citing 20 U.S.C. § 1414(c)(4)); *see also* Tr. at

26

210-213 (Giurato explaining that the evaluations before the CSE were "relatively recent" and "[t]here was no need to have [J.B.] reevaluated").

### b.  Meaningful Participation

Plaintiffs' argument that the DOE did not afford L.B. and the Cooke staff an opportunity to participate meaningfully in the January 2010 CSE meeting is founded primarily on (i) the CSE's purported failure to provide copies of the evaluative materials or to read them aloud during the meeting, (ii) Prusock's participation in only a portion of the meeting, (iii) the absence from the meeting of J.B.'s speech and language and occupational therapists, and (iv) the CSE's purported failure to seek input on the 2010-11 goals from the Cooke staff.  Pls. Br. at 12-15.

As an initial matter, while the Parents included a meaningful participation claim in the Due Process Complaint, *see* Parents' Ex. A (Due Process Complaint) at 1-2, neither the IHO nor the SRO reached a decision on the issue and the parties disagree as to whether it is properly preserved for this Court's review.  The SRO declined to consider the meaningful participation issue as part of its general declination to consider the Parents' Cross-Appeal, which, as noted, was based on the accurate observation that the Answer and Cross-Appeal failed to "specify or 'clearly indicate the reasons for challenging the [IHO's] decision,'" "'identify[] the findings, conclusions, and orders to which exceptions [were] taken,'" or "clearly identify[] which particular issues that [the Parents] believe[d] the IHO erroneously failed to decide."  SRO Decision at 5 n.3 (quoting 8 N.Y.C.R.R. § 279.4(a) (setting forth the general requirements for petitions for review of IHO decisions)).  The Parents urge the Court to disregard the SRO's position and consider their meaningful participation argument.  They argue that, in the IDEA context, appeal is permitted – and therefore required to preserve issues – only to the extent that a party is "aggrieved" by an IHO's decision.  Pls. Br. at 9.  Because, the Parents continue, the

IHO's failure here to decide the meaningful participation issue while ultimately awarding reimbursement did not "aggrieve" the Parents, no appeal was necessary to preserve the issue for the Court's consideration.[9]   *Id.*   While the case law is not uniform, "[m]ost judges in this district" have indeed "concluded that when an IHO rules in favor of a parent on some grounds, but fails to reach other grounds alleged in the parent's due process complaint, the parent's failure to cross-appeal those issues to the SRO does not result in their waiver."   *See T.G. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 337-38 (S.D.N.Y. 2013) (collecting cases).   As the DOE correctly notes, however, the case law addressing this issue tends to involve parties who, after succeeding on at least one dispositive issue before an IHO, declined to cross-appeal *altogether*.   Def. Br. at 18-19.   Here, by contrast, the Parents chose to cross-appeal – apparently thinking themselves sufficiently "aggrieved" by some undecided issue to do so – but simply failed to comply with the clarity and sufficiency requirements for identifying the issues for appellate consideration.   That failure, the DOE argues, must result in waiver.   *Id.*

It is unnecessary to resolve this procedural dispute, because regardless of whether the meaningful participation claim is properly before the Court, the record reflects, upon *de novo* review, that L.B. and the Cooke staff had a full opportunity to participate in the CSE meeting. Accordingly, and as explained further below, the Parents' claim fails on the merits.   *See T.G.*, 973 F. Supp. 2d at 338 (finding no procedural violation by district "regardless" of whether parents' failure to cross-appeal had waived the relevant claim).

The IDEA requires that "parents of a child with a disability be given an opportunity 'to

---

[9] While the Parents also argue more generally that the "SRO improperly declined to consider *several* of Plaintiffs' claims that were not addressed by the IHO," Pls. Br. at 9 (emphasis added), the meaningful participation claim is the only such claim that the Parents identify in their briefing.   Accordingly, the Court construes this argument to be directed only at the meaningful participation issue.

examine all records relating to [their] child and to participate in meetings with respect to the

identification, evaluation, and educational placement of the child, and the provision of a free

appropriate public education to [their] child, and to obtain an independent evaluation of the

child.'" *J.P. v. N.Y.C. Dep't of Educ.*, 10-cv-3078, 2012 WL 359977, at \*8 (S.D.N.Y. Feb. 2,

2012) (quoting 20 U.S.C. § 1415(b)(1)) (brackets in original).   While the Parents are correct that

the CSE did not affirmatively provide physical copies of certain evaluative materials to L.B.,

Prusock, and Tabone, there is ample evidence that all three participants had independent access

to many of the pertinent materials, or at least the underlying information, as of the time the

meeting, and that L.B. was advised of her right to inspect J.B.'s records.   Cooke itself generated

the November 2009 Progress Report and provided it directly to the CSE, and Tabone testified

that he reviewed it prior to the CSE meeting and was "well-informed" about J.B.'s progress

during the then-current school year going into the meeting.  Tr. at 213-14, 282-83, 494.  L.B.

testified that she received a copy of J.B.'s Classroom Observation (which was conducted during

a Cooke classroom session) from the DOE prior to the CSE meeting.  Tr. at 481.  L.B. also

conceded that she participated in the development of the Social History Update, and a review of

that document makes clear that it consisted largely of information that L.B. herself provided to

the DOE.  DOE Ex. 8 (Social History Update) at 1 (noting that L.B. "attended the interview,

signed consent and provided most of the information contained in this report"); Tr. At 494.

Giurato testified, moreover, that since J.B. attended Cooke during the 2009-10 school year,

Cooke "would have had a copy of the IEP from the prior year that was given to them by the

[P]arents," and likely also at least the  recent "testing" reflected in the Psycho-Educational

Evaluation and the Social History Update.  Tr. at 192-93.  Tabone, for his part, confirmed that

J.B.'s IEPs generally "would have been given to us by [J.B.'s] parents."  Tr. at 279.  Notably,

29

the 2009-10 IEP, which was in effect at the time of the January 2010 CSE meeting, set forth

several of the pertinent, bottom-line conclusions from both the Psycho-Educational Evaluation

and the Social History Update. *See* Parents' Ex. D (2009-10 IEP) at 3-6. Finally, to the extent

that L.B. required any documentation concerning J.B. to which she did not have access, the

minutes of the January 2010 CSE meeting reflect that L.B. was explained her due process right

to receive copies of J.B.'s records. DOE Ex. 4 (CSE Meeting Minutes) at 1.

      Even assuming both that L.B. and/or one of the Cooke participants did not have her or his

own copy of the documents during the course of the meeting and that the lack of copies reflects

error on the part of the DOE, the Court sees no reason why any such error deprived J.B. of a

FAPE. *See, e.g.*, *P.G. v. N.Y.C. Dep't of Educ.*, 959 F. Supp. 2d 499, 510 (S.D.N.Y. 2013) (the

"Second Circuit has been clear that not every error in the process of developing an IEP results in

the denial of a FAPE") *see also* 20 U.S.C. § 1415(f)(3)(E)(ii). Tabone testified, for example, that

from Cooke's perspective, participation in CSE meetings was "routine," and, as a result, "there

wouldn't have been anything specific that [they] needed to review" in connection with such

meetings. Tr. at 283-84. Tabone further noted that, to the extent that he "may have missed a

point or two" on J.B.'s progress or functionality during the meeting, it would not "have had any

major impact on the discussion" and additional reporting or requests for changes could always be

made following the meeting if necessary (but were not required in J.B.'s case). Tr. at 283.

      There is nothing in the record to suggest that L.B. or the Cooke participants requested

during the CSE meeting that any documents be provided in physical form or read aloud to the

participants, or that anyone expressed concern that any lack of access to documents hindered

participation in or understanding of the proceedings. There is evidence, however, that neither

L.B. nor the Cooke participants objected or unsuccessfully requested additions to the final set of

goals included in the IEP.  Tr. at 187-88, 501-02.

The record also reflects that, whether she had copies of certain documents or not, L.B. played an active role in the CSE meeting.  As discussed above, L.B., among other things, shared concerns with the CSE regarding J.B.'s introduction to "new material" and the impact of certain recent health problems on J.B.'s physical activity, participated in a discussion of program options, and convinced the CSE to retain a classification of speech and language-impaired for J.B. rather than reclassify him as learning disabled.  DOE Ex. 4 (CSE Meeting Minutes) at 1-2; Tr. at 190-91, 500-01.

Accordingly, the Court concludes that a preponderance of the evidence shows that any failure on the part of the DOE to provide or read aloud copies of evaluative materials during the CSE meeting did not impede J.B.'s ability to participate meaningfully or otherwise deprive J.B. of a FAPE.  *See, e.g.*, *T.C. v. N.Y.C. Dep't of Educ.*, 15-cv-2667, 2016 WL 4449791, at *15 (S.D.N.Y. Aug. 24, 2016) ("[N]othing in the record suggests that [the parent's] failure to receive a draft of the IEP during the course of the meeting prevented her from participating in the CSE's discussion; indeed her comments and concerns were incorporated into the document."); *P.G.*, 959 F. Supp. at 508-09 (no violation where parent not provided with her own copy of proposed IEP during meeting because CSE continually solicited input thereon from parent and parent failed to ask to see a physical copy of the document); *see also Cerra*, 427 F.3d at 193 (parent had an opportunity to contribute meaningfully to CSE meeting because parent was "significantly involved in developing [the student's] educational program" and "actively participated in discussing [the student's] needs") (internal quotation marks omitted).

The Parent's attendance-based challenges to the CSE meeting are likewise unavailing. Applicable federal and New York statutes together require that an IEP team be composed of the

student's parents; at least one special education teacher of the student; at least one regular

education teacher of the student (if the child is, or may be, participating in the regular education

environment); a representative of the school district; a school psychologist; an individual

qualified to interpret the implications of evaluation results; a parent of another child with a

disability residing in the relevant district or a neighboring one; a school physician (if specifically

requested); and, at the discretion of the parent or the district, other individuals who have

knowledge or special expertise regarding the child, including related services personnel as

appropriate. 20 U.S.C. § 1414(d)(1)(B); 8 N.Y.C.R.R. § 200.3(a)(1). The record before the

Court reflects that the CSE was, at least at the outset of the meeting, composed of all required

individuals.

There is no dispute that J.B.'s then-current occupational therapist and speech and

language therapist did not attend the January 2010 CSE meeting. Their absence, however, does

not reflect procedural error. Related service providers are not required IEP team members. *See*

20 U.S.C. § 1414(d)(1)(B)(vi) (related services personnel to be included only "as appropriate"

and "at the discretion of the parent or the agency"); 8 N.Y.C.R.R. 200.3(a)(1)(ix) (same).

Furthermore, there is no suggestion that either specific provider's participation in the meeting

was requested in the exercise of the discretion statutorily afforded to the Parents or the DOE, or

that the Parents objected to or otherwise voiced concern regarding their absence. Such absence

was also not for lack of invitation or notice; the DOE specifically invited "Cooke Center staff" –

without limitation or qualifier – to attend the CSE meeting, and advised L.B. more than one

month before the meeting of her right to "bring other individuals who have knowledge or special

expertise regarding your child." DOE Ex. 5 (Notice of IEP Meeting) at 1; *see also* Tr. at 213

(Giurato explaining that the service providers were "invited" to the CSE meeting and that either

32

the Parents or Cooke could have arranged for their attendance).  Finally, especially given that the

CSE had access to progress reports prepared by both providers approximately two months

earlier, Tr. at 193-94, 213; DOE Ex. 9 (November 2009 Progress Report) at 7, 15, there is

nothing to suggest that their failure to appear at the CSE meeting in person deprived J.B. of a

FAPE.

      Similarly, a preponderance of the evidence supports a finding that Prusock's departure

from the meeting following discussion of the math-related portions of the IEP – while technically

a procedural violation given the apparent lack of written consent from L.B., 20 U.S.C. §

1414(d)(1)(C) – also did not deny J.B. a FAPE.  The record reflects that the CSE received

information from Prusock regarding J.B.'s recent test results, present level of performance,

current needs, and current goals in math before she departed from the meeting, and Prusock

confirmed that she described J.B.'s current functioning in math "accurately" during that portion

of the meeting.  Tr. at 173, 181-84, 466-68, 471-73.  The CSE developed J.B.'s math goals for

the 2010-11 school year by then "expanding" upon J.B.'s current performance level and

objectives "moving forward."  Tr. at 182; SRO Decision at 14 n.10.  Prusock testified that she

was not asked by anyone to leave the meeting, Tr. at 472-73, and the record does not suggest that

anyone raised objection to her departure.  It is undisputed, moreover, that Tabone – the assistant

head of Cooke, a certified special education teacher, and a certified school psychologist –

remained for the entirety of the meeting and relayed information on the rest of the curriculum

areas based on his "regular" meetings with J.B.'s teachers and service providers regarding J.B.'s

progress.  Tr. at 171, 246-47, 270-71, 281-84.[10]

---

[10] Giurato, who is also a certified special education teacher, also attended the entire meeting.

Under the circumstances, the Court sees no basis to conclude that Prusock's departure following the math discussion deprived J.B. of a FAPE. *See P.G.* 959 F. Supp. 2d at 510-11 (no deprivation of a FAPE where disabled student's special education teacher participated in a discrete portion of a CSE meeting by phone and departed, without objection from parent, after participating in "the academic discussion for which her presence was most relevant"); *see also M.C. v. N.Y.C. Dep't of Educ.*, 14-cv-6968, 2015 WL 4464102, at *5 (S.D.N.Y. Jul. 15, 2015) (absence of student's current special education teacher from CSE meeting did not deprive student of FAPE because CSE had "ample evaluative material from which to craft the IEP," including a recent IEP developed in part by student's special education teacher).

Finally, Plaintiffs argue that the DOE committed procedural error by affording the Cooke participants insufficient opportunity to provide input on J.B.'s goals for the 2010-11 school year. Pls. Br. at 14-15. The Court disagrees. Consistent with the SRO's conclusion, *see* SRO Decision at 13-14, a preponderance of the evidence demonstrates that the DOE solicited from Tabone and Prusock – and derived from the November 2009 Cooke Progress Report – information on J.B.'s performance levels and progress toward his then-operative goals and objectives and then, depending on whether J.B. appeared likely to achieve those goals during the 2009-10 school year, either "expanded" upon them "moving forward" or substantially retained them. *See, e.g.*, Tr. at 172-73, 182, 192-94, 199-204, 210, 212, 214-15, 467-69, 473.

Plaintiffs rely heavily on testimony by Prusock and Tabone to the effect that they were not specifically prompted during the CSE meeting to opine independently on appropriate goals for the following school year and never specifically expressed the view that J.B.'s then-current goals would continue to be suitable the following school year. *See* Pls. Br. at 14. Not only is that testimony contradicted by that of the special education teacher who chaired the CSE

34

meeting, *see e.g.*, Tr. at 202-03, 215, it is also belied by the undisputed fact that neither Tabone

nor L.B. raised any objection to the final goals included in the 2010-11 IEP or requested that any

additional goals be added, Tr. at 187-88, 501-02.[11]   What is more, while there is no doubt that it

is incumbent upon the DOE to afford parents and outside experts an opportunity to participate in

meetings, the lack of some specific question or set of questions does not necessarily equate to a

denial of that opportunity.   Certainly, Prusock and Tabone – veteran educators with advanced

degrees and experience participating in CSE meetings – could have interjected, if necessary, to

share any concerns that the information that they were concededly providing was being used to

create future goals that were in some way inappropriate.

In any event, notwithstanding any after-the-fact disagreement by the Cooke staff, the

Court sees no reason why the CSE could not make informed decisions about appropriate goals

for the following school year based on the evaluative materials discussed above coupled with

input from J.B.'s then-current school staff on recent test results, present academic performance,

and progress toward current objectives.   *Cf. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d

---

[11] Plaintiffs also rely on testimony by Prusock that, at the time of the CSE meeting, it was her understanding that the IEP under development would be implemented immediately after the meeting, rather than at the start of the 2010-11 school year. Pls. Br at 14 (citing Tr. at 472). The Court has a difficult time crediting such testimony, which was not relied upon by either the IHO or the SRO. As J.B.'s then-current math teacher, there is no dispute that Prusock had access to J.B.'s then-operative IEP, which unambiguously covered a one-year period starting in September 2009. Parents' Ex. D (2009-10 IEP) at 2; *see also* Tr. at 279 (Tabone testifying that J.B.'s parents provided Cooke with J.B.'s IEPs while he was a student at the school). Prusock did not recall being told that the IEP created during the January 2010 CSE meeting would take effect immediately, and she provided no explanation as to the basis for her presumption to that effect. Tr. at 471-73. Of note, the Notice that formally called the January 2010 CSE meeting prominently identified the meeting's purpose as "Reevaluation/Annual Review." DOE Ex. 5 (Notice of IEP Meeting) at 1. As is there is no evidence in the record of any suggestion at the CSE meeting either that a reevaluation of J.B. had taken place or been requested by the Parents or the DOE, the Court sees no reason why it should not have been clear to Prusock, who had participated in CSE meetings before, Tr. at 471, that the meeting was convened for an annual review to develop IEP for the beginning of the following school year. *See, e.g., N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d at 590 (IDEA and New York law "only require that a school district have an IEP in effect at the *beginning* of the applicable school year") (internal quotation marks and brackets omitted) (emphasis in original); 34 C.F.R. § 300.323(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii); *see also* 34 C.F.R. 300.303(b)(1)-(2); 8 N.Y.C.R.R. § 200.4(b)(4) (circumstances under which reevaluations take place); Tr. at 213 (no meeting participant requested any new evaluations of J.B).

371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions

of plaintiffs and their outside professionals does not mean that plaintiffs were denied the

opportunity to participate in the development of the IEP's, or that the outcomes of the CSE

meetings were 'pre-determined.'  A professional disagreement is not an IDEA violation.").

Accordingly, the Court concludes that a preponderance of the evidence demonstrates that

Plaintiffs were not denied an opportunity to participate meaningfully in the development of

J.B.'s IEP.

### c.    **Transition Plan**

Finally, the Parents attack the post-secondary school transition plan included in J.B.'s

IEP.  They argue that while the SRO was correct in concluding that the plan was "vague and

generic," "sparse," and "technically deficient," the SRO erred in holding that these shortcomings,

"when viewed in the context of the IEP, as a whole," did not rise to the level of denying J.B. a

FAPE.  Pls. Br. at 17-18; SRO Decision at 17-18.

The IDEA requires that "appropriate measurable post-secondary goals and related

services, based upon age appropriate transition assessments related to training, education,

employment, and, if appropriate, independent living skills, be included in IEPs for students

sixteen years or older," while New York regulations "provide similar requirements for students

who" – like J.B. as of the January 2010 CSE meeting – "are at least fifteen years old." *J.M. v.*

*N.Y.C. Dep't of Educ.*, 15-cv-353, 2016 WL 1092688, at * 6 n.8 (S.D.N.Y. Mar. 21, 2016)

(citing 20 U.S.C. § 1414(d)(1)(A)(VIII); 34 C.F.R. § 300.320(b); 8 N.Y.C.R.R.

§ 200.4(d)(2)(ix)).  The IEP at issue here provided that J.B. would pursue an IEP diploma and set

forth four long-term adult outcomes for J.B., including that he would: (i) "integrate into the

community with moderate support"; (ii) "attend a post-secondary educational or vocational

program"; (iii) "live independently with moderate support"; and (iv) "be employed with

moderate support." DOE Ex. 3 (IEP) at 16.  The services provided to facilitate J.B.'s

achievement of such goals included "participat[ion] in instructional activities that will highlight

his areas of strength and interest"; "participat[ion] in community activities and . . .

develop[ment] [of] his areas of interest and strength"; "explor[ation] [of] post-secondary

programs that focus on his areas of strength as well as his areas of need"; "travel training to help

him better navigate urban travel"; and school-based assistance with a variety of independent

living skills, such as "creat[ing] [a] budget and learn[ing] how to manage expenses (use of

checkbook, paying bills)" and "develop[ing] organizational skills to help manage important

papers." *Id.* at 16-17.

        The Court agrees with the SRO and the IHO that this plan was, for the most part, "vague

and generic," particularly insofar as the goals largely lacked measurable components and many

of the services are listed without detail as to the types of activities contemplated, the areas of

interest, strength, and need to be addressed, and the parties responsible for implementation.

Nevertheless, "[w]hile a more comprehensive transition plan may have been beneficial . . . the

IEP did begin the process of planning" for J.B.'s "adult life by providing outcomes for

community integration, post-secondary placement, independent living, and employment even

though [he] was still years away from graduation age." *A.D.*, 2013 WL 1155570, at *11.

Moreover, the transition plan's lack of specifics as to the transition services to be delivered to

J.B. was, at least to some degree, mitigated by the inclusion elsewhere in the IEP of goals and

specific short-term objectives aimed at improving particular skills that would ultimately help J.B.

to achieve the types of long-term outcomes described in the transition plan. *See, e.g.*, *C.W.*, 2016

WL 1230794, at *4; *J.M.*, 2016 WL 1092688, at *7.  For example, the IEP included goals and

objectives in the areas of OT, speech and language, and counseling expressly designed to help J.B. improve "the skills necessary for independence within the school, home, and community," "pragmatic language skills," self-advocacy skills, and "social reasoning and problem-solving." DOE Ex. 3 (IEP) at 10-12. Accordingly, especially when the transition plan is viewed in the context of the IEP as a whole, as the SRO correctly observed it must be, *see e.g.*, *J.M.*, 2016 WL 1092688, at *7, the Court finds – consistent with many recent decisions in this District – that the plan's deficiencies standing alone did not deprive J.B. of a FAPE. *See, e.g.*, *J.M.*, 2016 WL 1092688, at *7; *M.Z.*, 2013 WL 1314992, *9; *A.D.*, 2013 WL 1155570, at *11.

For the foregoing reasons, the Court concludes that a preponderance of the evidence shows that the DOE substantially complied with applicable procedural requirements in developing J.B.'s 2010-11 IEP, and, where it may have technically fallen short, such violations did not rise to the level of denying J.B. a FAPE.

### 2.    The IEP Was Substantively Sufficient

The Parents attack the substantive sufficiency of J.B.'s IEP on three primary fronts. First, they argue that it failed to comprehensively describe J.B.'s then-current performance and functionality levels. Second, they argue that the IEP's recommended placement in a specialized school and in a special class with a 12:1:1 teacher-paraprofessional-student ratio was inappropriate. Third, they contend that the annual goals included in the IEP were inadequate. Pls. Br. at 15-20. The Court considers these arguments in turn, bearing in mind that, "[i]n light of the relative institutional competence of the state's adjudicators in addressing matters of education policy, more deference is owed to the SRO's decision regarding the substantive adequacy of the IEP than was owed in the prior analysis regarding procedural adequacy." *P.G.*, 959 F. Supp. 2d at 511.

38

### a.      Description of Present Performance and Needs

The Parents argue that the IEP was deficient because it failed to accurately describe J.B.'s then-present levels of performance and needs.  Specifically, the Parents contend that the IEP "failed to adequately specify the basis for the functional levels provided; failed to describe or provide the extent or intensity of the direct, individual support from a teacher that J.B. required to make measurable progress; and failed to accurately reflect the depth of J.B.'s academic and social issues." Pls. Br. at 15-16.  The Parents do not explain their position beyond these bare assertions.  They fail to provide, for instance, any examples – by record citation or otherwise – of specific matters that the IEP purportedly omitted or of any resultant deficiencies in the IEP's substantive recommendations.  Nor do they identify any particular legal requirements with which the IEP's description of J.B. did not comport.

As a general matter, an IEP is required to state "the child's present levels of academic achievement and functional performance," including "how the child's disability affects the child's involvement and progress in the general education curriculum."   20 U.S.C. § 1414(d)(1)(A)(i)(I); 8 N.Y.C.R.R. 200.4(d)(2)(i).  The IHO did not consider the sufficiency of the IEP's statements to this effect.  The SRO addressed the issue at length, however, and found no legal deficiencies, whether of the sort complained of by Plaintiffs or otherwise.  To the contrary, the SRO found that the IEP set forth an adequate summary of J.B.'s present levels of performance based upon "input from the Cooke staff, as well as the evaluative information" available to the CSE and, correspondingly, that the CSE "had sufficient information relative to the student's present levels of academic achievement and functional performance – including the teacher reports and estimates of the student's current skill levels" – to "develop an IEP that accurately identified and reflected the student's special education needs." SRO Decision at 13.

39

To arrive at this conclusion, the SRO thoroughly canvassed the IEP's description of J.B. and compared it to the Cooke Progress Report and teacher-reported test results, noting that the IEP accurately identified J.B.'s grade-level functionality, relative strengths and weaknesses, recent improvements, areas of need, and particular assistance requirements in math, reading comprehension, written expression, speech and language, and OT. *Id.* at 11-13. It further observed that J.B.'s social and emotional functioning as reported in the IEP accurately reflected specific information drawn from the Cooke Progress Report and other evaluative materials. *Id.* at 12.

The only potential flaw identified by the SRO was the IEP's failure to adequately describe the "student's difficulties with organization and attention." *Id.* at 12 n.8. The SRO saw no reason, however, why this omission standing alone would deprive J.B. of a FAPE, and the Court concurs. Indeed, Courts in this District are in agreement that "[e]very aspect of a student's specific educational issues does not need to be detailed in the IEP, as long as the IEP [is] designed to specifically address those issues." *G.B. v. N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 250 (S.D.N.Y. 2015). The IEP's academic management recommendations were, as confirmed by Giurato at the impartial hearing, designed in large measure specifically to address J.B.'s organizational and attentional deficits, and accordingly, the lack of elaboration on such deficits in the present performance section does not render the IEP substantively deficient. DOE Ex. 3 (IEP) at 3-5; Tr. at 174-76, 180-81; *see also T.C.*, 2016 WL 4449791, at *19 ("Because the CSE accounted for [the parent's] concerns and the progress reported by [the private school] staff in formulating objectives for [the student], the IEP's lack of information on [the student's] baseline functioning in this discrete area does not amount to a denial of a FAPE."); *P.G.*, 959 F. Supp. 2d at 512 (IEP adequate despite "not specifically identifying certain of [the student's]

issues," because it "detailed a program that was designed to address precisely those issues").

The Court agrees with the SRO's analysis of this issue and concludes that the IEP adequately stated J.B.'s then-current performance levels.

### b.    Annual Goals

The IDEA and its regulations require that an IEP include "short-term and long-term academic and nonacademic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short-term and long-term goals." *P.G.*, 959 F. Supp. 2d at 512; *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(II)-(III); 34 C.F.R. § 300.320(a)(2)-(3); 8 N.Y.C.R.R. § 200.4(d)(2)(iii)-(iv). Such goals must be designed "to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and to meet each of the child's other educational needs that result from the child's disability." *C.W.*, 2016 WL 1230794, at *5 (internal quotation marks omitted). As the Court of Appeals has explained, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003). Courts in this Circuit, moreover, are generally "reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress." *G.B.*, 145 F. Supp. 3d at 251 (internal quotation marks omitted).

J.B.'s IEP, as discussed, reflected approximately nine annual goals supported by approximately thirty-eight short-term objectives and includes a set of academic management mechanisms to assist J.B. in working toward those goals. DOE Ex. 3 (IEP) at 3-5, 8-12. It further provided that there would be three reports on J.B.'s progress toward the goals during the school year, and indicated that J.B.'s performance would be assessed by teacher-developed

materials, observations, and portfolio reviews. *Id.* at 8-12, 15.

The Parents contend principally that the goals were insufficiently measurable, failed to address all of the needs arising from J.B.'s disabilities (particularly in the speech and language area), and reflected inadequate inquiry into the continuing appropriateness – or lack thereof – of the goals set forth in the November 2009 Cooke Progress Report. Pls. Br. at 18-20. The IHO, contrary to Plaintiff's suggestion, reached no legal conclusion as to whether the goals were sufficiently measurable, but did deem the speech and language goals substantively insufficient in light of testimony by Cooke speech therapist Jana Agopian and agreed that the DOE improperly "prepared many of the goals without adequately calculating whether [the Cooke] teacher reports would be sufficiently current information to form the basis of an IEP for the 2010-11 [school year]." IHO Decision at 11. The SRO disagreed, concluding that "the annual goals and short-term objectives . . . were consistent with the student's identified needs in all areas" and that the design of the goals reflected no error. SRO Decision at 13-15. The Court agrees with the SRO's determination.

First, as to Plaintiffs' assertion that the IEP's goals were insufficiently measurable, the Court notes that while the IEP's nine goals themselves were to some extent broadly worded and qualitative, "all contain[ed] short-term objectives with quantifiable assessments." *T.C.*, 2016 WL 4449791, at *19. For example, J.B.'s English language arts goals included objectives that J.B., among other things, would "respond to 'wh' question on passages/stories of increasing length in 4/5 reading samples with 80% mastery" and "respond to inference and critical thinking questions based on passages/stories of increasing length in 4/5 reading samples with 80% mastery." DOE Ex. 3 (IEP) at 9. Similarly, J.B.'s written expression goal was supported by objectives that J.B., among other things, would "write 10 simple declarative sentences using

proper noun/verb agreement, syntax, punctuation and capitalization in 4/5 samples" and "write a simple five sentence paragraph having an introductory sentence, three supporting detail sentences, and a concluding sentence using properly written sentences with 80% master." *Id.* at 10. The two annual goals concerning math were supported by ten specific, quantifiably measurable objectives, including that J.B. would "by using charts and manipulative[s] demonstrate understanding of place value for tens, ones and hundreds in 4/5 trials with 80% mastery" and "solve 8/10 problems requiring addition of three-digit numbers without regrouping in 4/5 trials." *Id.* at 8. J.B.'s speech and language goal included several particularized objectives, including that J.B. would "appropriately initiate, maintain, and terminate a conversation with peers in 4/5 sessions with 80% on-target behaviors as observed by therapist." *Id.* at 10. "In light of the manifest specificity" and objectively measurable nature "of the IEP's [short-term] objectives," the Court will not disturb the SRO's determination that the goals were adequate to provide a FAPE based on any purported lack of measurability. *T.C.*, 2016 WL 4449791, at *19-20 (collecting cases); *A.D.*, 2013 WL 1155570, at *10-11; *see also D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 359 (S.D.N.Y. 2013) ("When an IEP contains a significant number of specific short-term objectives to supplement otherwise broad annual goals, the vagueness of the annual goals alone will not rise to the level of a denial of a FAPE."), *aff'd* 630 Fed. App'x 73 (2d Cir. 2015).

Plaintiffs' second argument – that the goals and objectives in the IEP failed to appropriately address all of J.B.'s speech and language, reading, and writing needs – raises matters of pure "educational policy," and the SRO Decision on this issue, which is "well-reasoned and thorough," is accordingly entitled to deference. *P.G.*, 959 F. Supp. 2d at 512-13. The SRO marshalled J.B.'s identified deficits in these areas and then identified the specific goals

43

and short-term objectives (as well as related services) designed to facilitate improvement. SRO

Decision at 14-15. In so doing, the SRO refuted with particularity the IHO's sole basis for

finding a subset of the goals insufficient. Specifically, noting the IHO's suggestion that the goals

disproportionately focused on articulation at the expense of pragmatic language, receptive

language, reading comprehension, and writing, the SRO identified individual goals addressing

each of the four allegedly neglected areas. *Id.* at 15.[12] To the extent that Plaintiffs argue that the

SRO erred by crediting DOE witnesses and failing to adopt the testimony of Cooke witnesses

that certain goals were inappropriate, Pls. Br. at 19-20, the Court notes that "it is not [its] role . . .

to 'choose between the views of conflicting experts on controversial issues of educational policy

in direct contradiction of the opinions of state administrative officers who had heard the same

evidence.'" *N.M.*, 2016 WL 796857, at *7 (quoting *M.H.*, 685 F.3d at 240 (internal quotation

marks and alterations omitted)). Faced with the same record presented to the SRO, the Court

defers to its conclusion with respect to the sufficiency of J.B.'s goals.

The Parents' last challenge to the goals is the contention that the CSE failed to inquire as

to the continued appropriateness of the goals set forth in the November 2009 Cooke Progress

Report for the 2010-11 school year. Pls. Br. at 14, 20-21. This argument fails for at least two

reasons. First, as a factual matter, it does not square with the record. A preponderance of the

---

[12] Of note, the IHO's concern on this point appears to have been based in the first instance on highly questionable testimony. The IHO premised its concern regarding the goals entirely on Agopian's testimony during examination by the Parents that the focus on articulation in the speech and language section of the IEP was inappropriate because J.B. needed to work more on receptive language along with "reading comprehension," "writing," and "reading fluency." *See* IHO Decision at 11-12; Tr. at 327-328. Subsequently, however, Agopian conceded that she had made the assertion based on a single portion of the IEP and that she had never reviewed the remainder of the IEP. Tr. at 327-30. Other sections of the IEP, as the SRO noted, in fact included goals aimed at improving J.B.'s performance in listening comprehension, reading, and written expression with three, three, and four corresponding short-term objectives, respectively. DOE Ex. 3 (IEP) at 9-10; *see also* SRO Decision at 15. When questioned on the substance of the writing-based objectives, Agopian agreed that several related to tasks that J.B. was indeed still working on mastering as of the 2010-11 school year. Tr. at 330-33.

evidence reflects that the CSE did not, as the Parents would suggest, blindly adopt goals from the Cooke Progress Report wholesale. Rather, it shows that the CSE sought information from Cooke on J.B.'s progress toward those goals and then made considered decisions (with Cooke staff in attendance) as to whether to "expand" upon the goals or retain them as currently constituted. Tr. at 171, 173, 178-79, 182-86 200-04. Indeed, as the DOE notes,[13] a comparison between the goals included in the IEP and those set forth in the November 2009 Cooke Progress Report confirms that certain goals and objectives were substantially copied over, while others were developed to account for J.B.'s progress to date. For instance, the Progress Report noted that J.B. had achieved an understanding of how to "use graphs to ask and answer simple questions and draw conclusions," so the corresponding IEP objective for the following year reflected that J.B. would develop the skill further by working on "creat[ing] and us[ing] graphs and charts to respond to math questions related to real life situation[s]." *Compare* DOE Ex. 9 (November 2009 Cooke Progress Report) at 5 *with* DOE Ex. 3 (IEP) at 8. By contrast, the Progress Report indicated that J.B. had achieved only a "partial understanding" of "identif[ying] places in numbers and the values of the digits in those places" and of "read[ing] and writ[ing] whole numbers up to 1,000,000," and the IEP objectives for the following year accordingly reflected that J.B. would "by using charts and manipulative[s] demonstrate understanding of place value for tens, ones and hundreds in 4/5 trials with 80% mastery." *Compare* DOE Ex. 9 (November 2009 Cooke Progress Report) at 5 *with* DOE Ex. 3 (IEP) at 8. Similarly, the Progress Report reflected that J.B. had a satisfactory "independent understanding" of "who to share and not share personal information with" in social settings but only a "partial" ability to report hi basic

---

[13] *See* Defendant's Reply Memorandum of Law in Further Support of Its Cross Motion for Summary Judgment ("Def. Reply") at 9-10.

personal information (e.g., phone number, address) from memory. The IEP, accordingly, incorporated the latter objective but not the former. *Compare* DOE Ex. 9 (November 2009 Cooke Progress Report) at 12 *with* DOE Ex. 3 (IEP) at 11.

Perhaps more importantly, the Parents do not explain *why* it would be inappropriate – or inconsistent with any applicable statute or regulation – for the DOE to rely heavily on goals developed by J.B.'s then-current teachers and service providers just two months prior to the CSE meeting when formulating the IEP. Nor do they cite any legal authority for the proposition. Courts in this Circuit have frequently approved IEP goals drawn from recent scholastic progress reports. *See, e.g., N.M.*, 2016 WL 796857, at *7 ("That the Cooke report was still dealing with the 2011-12 school year, whereas the IEP provided for the 2012-13 school year, does not by itself make the IEP's goals inadequate. Indeed, given that the Cooke Report and the CSE meeting were only one month apart, it seems reasonable that the report, developed by [the student's] then-teachers and counselors, would play a significant role in the IEP's development."); *A.M. v. N.Y.C Dep't*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013) (goals for 2010-11 school year drawn from November 2009 Cooke progress report were not "redundant" and there was "no authority for the proposition that drawing goals from a teacher's progress report is violation of the statute or regulations"); *see also M.H.*, 685 F.3d at 256 (goals copied from student's pre-school CSE meeting a few months earlier were not inadequate if there was evidence that they remained appropriate for student); *G.B*, 145 F. Supp. 3d at 251 (noting that "[c]ourts in this Circuit have . . . found that goals are not 'per se inappropriate' simply because they were copied from a prior report"). Under the circumstances presented here, the Court – consistent with the SRO Decision – concludes that such reliance did not deprive J.B. of a FAPE. Giurato testified that, insofar as many of the goals included in the 2010-11 IEP were similar to

46

those that J.B. was reported to be pursuing as of the January 2010 CSE Meeting, that was

because J.B.'s academic functionality levels had remained largely static and more advanced

goals were not yet appropriate. *See, e.g.*, Tr. at 199-203; *see also J.C.S.*, 2012 WL 3975942, at

*11 ("in light of [student's] academic needs remaining substantially the same, the CSE's

decision to draw [certain of the new goals] from the prior IEP did not result in the denial of a

FAPE").   Agopian confirmed that several of the IEP's writing-related objectives, for example,

corresponded to targets that J.B. was still working to achieve as of the 2010-11 school year.   Tr.

at 330-333.   Prusock testified that several of J.B.'s math-related short-term objectives

represented tasks that J.B. was still "working on" or could do only "inconsistently" as of the end

of the 2009-10 school year.   Tr. at 474-76.   Accordingly, the fact that many of J.B.'s 2010-11

goals may have been sourced from the November 2009 Progress Report did not deprive him of a

FAPE.

c.   **Program Recommendation**

The Parents next challenge the IEP's recommendation that J.B. be placed in a self-

contained 12:1:1 special class in a specialized school.   They argue principally that such a setting

"would not have provided J.B. with the level of individual support and attention from a teacher

that he required in the classroom" and "would not have provided him with appropriate peers or

peer models."   Pls. Br. at 16.

The IHO did not address the substantive adequacy of the IEP's program

recommendation.   The SRO found that the "evidence in the hearing record supports a finding

that the [12:1:1] special class placement at a specialized school was appropriate to meet the

student's education needs."   SRO Decision at 15-16.   The SRO noted, among other things, that

the CSE premised its decision on the student's "significant academic and cognitive delays" and

47

need for year-round instruction, and that it rejected J.B.'s previous placement in a 15:1 class as inadequately supportive. *Id.* Ordinarily, "[d]etermining what class size is appropriate for a student is exactly the sort of policy judgment on which the Second Circuit has instructed that this Court should defer to the SRO." *E.D. v. N.Y.C. Dep't of Educ.*, 12-cv-435, 2014 WL 1311761, at *13 (S.D.N.Y. Mar. 30, 2014) (internal quotation marks omitted). The Parents, however, urge the Court to disregard the SRO's decision on this issue because it purportedly ignored testimony from members of the Cooke staff to the effect that J.B. required more support than a 12:1:1 class with a teacher and a paraprofessional could provide. Pls. Br. at 16 (citing Tr. at 272, 372-73, 414-16).

It is true that the SRO primarily cited testimony from the DOE in reaching its decision on J.B.'s program and did not expressly grapple with contrary testimony of specific Cooke witnesses. The SRO did, however, explicitly address the sorts of underlying concerns that, a review of the record reflects, animated much of that testimony. For example, J.B.'s 2010-11 Cooke math teacher testified that J.B. benefited from smaller classes largely because he "required the repetition of information and instructions," "small-group instruction," and the presentation of information "in a variety of modes." Tr. at 373. The SRO observed, correspondingly, that the IEP – based in part on Cooke's input during the CSE meeting – called for a variety of academic management mechanisms to be employed within J.B.'s classroom to address his deficits in attention and organization and to facilitate completion of his assigned tasks and progress toward his goals. These included, as the SRO noted, "teacher guidance through questioning and modeling," "visual and verbal prompts," "small group instruction," and the breaking down of tasks into "small sequential tasks." SRO Decision at 16 n.11; *see also* Tr. 173-81 (Giurato describing bases for academic management recommendations).

48

Under the circumstances, and particularly given the lack of any contrary finding by the

IHO, the Court defers to the SRO Decision on the appropriateness of the recommended program.

New York law mandates that "[t]he maximum class size for those students whose special

education needs consist primarily of the need for specialized instruction which can best be

accomplished in a self-contained setting shall not exceed 15 students, or 12 students in a State-

operated or State-support school." 8 N.Y.C.R.R. § 200.6(h)(4).  "Within the general parameters

of 8 N.Y.C.R.R. § 200.6, class size and student-teacher ratios involve questions of methodology

more appropriately answered by the state and district decision-makers than by federal judges."

*D.J.*, 2013 WL 4400689, at *5 (internal quotation marks omitted).  In the Court's view, the SRO

Decision on the program recommendation is supported by the hearing record.  J.B. generally

functioned at a first grade or second grade level in several academic areas, and clearly required

significant support to make progress academically.  But he also had a relative strength in

listening comprehension, participated in class discussions and activities, followed directions and

rules, responded positively to encouragement and redirection when needing to be refocused,

completed homework in a timely fashion, organized and managed his classroom materials with

modest success, and did not engage in any behavior that seriously interfered with the educational

environment.   DOE Ex. 3 (IEP) at 3-6; DOE Ex. 7 (Psycho-Educational Evaluation) at 6; DOE

Ex. 9 (November 2009 Cooke Progress Report) at 2-12.

Giurato – a special education teacher with more than twenty-five years of experience and

a veteran of "hundreds and hundreds" of IEP developments, Tr. at 156-58 – testified that the

CSE recommended that J.B.'s program be downsized from a 15:1 classroom to a 12:1:1

classroom because his "academics [were] significantly delayed and he would benefit from being

in a class with a smaller amount of students" and from "additional adult support in the

classroom." Tr. 164, 190, 208; *see also* DOE Ex. 3 (IEP) at 14 ("A special class (15:1) in a community school was discussed, but rejected as not being sufficient to meet [J.B.'s] significant academic and cognitive delays.").[14]  Giurato further testified, however, that the recommended 12:1:1 program was "appropriate" for J.B. in her professional opinion, and that the combination of a teacher and one paraprofessional "would give him the support that he need[ed]." Tr. at 164, 190.  The IEP, in addition to requiring a second adult in J.B.'s classroom and providing for the variety of pedagogical and logistical support and management mechanisms discussed above, mandated that J.B. receive further small-group attention in the form of counseling, OT, and speech and language therapy in two or three-student settings four times per week, collectively. DOE Ex. 3 (IEP) at 14.

With regard to the selection of a specialized school over a community high school, Giurato testified simply that J.B. "need[ed] the benefit of a 12-month program to maintain his academic skills . . . over [the] summer months" and generally "prevent[] regression," and that twelve-month programs were unavailable at community schools. Tr. at 164.  The Parents do not substantially contest either point.

To be sure, Cooke personnel disagreed with the program recommendation.  Tabone testified – albeit vaguely – that J.B. had "pretty intense learning issues" and "need[ed] a tremendous amount of support," and opined that a 12:1:1 classroom would not have the "luxury" of giving J.B. "individualized attention."  Tr. at 272.  "Nevertheless, the law is clear that it is not for the federal court to choose between the views of conflicting experts on such questions." *K.F. v. N.Y.C. Dep't of Educ.*, 15-cv-1126, 2016 WL 3981370, *11 (S.D.N.Y. Mar. 31, 2016)

---

[14] L.B., for her part, agreed at least that a downward modification from the 15:1 recommendation was appropriate. Tr. at 500.

(internal quotation marks and brackets omitted) (citing *R.E.*, 694 F.3d at 189).  Nor is the

question for the Court whether "the class size was the best possible class size for [J.B.] but rather

whether it complied with New York regulations, and, with respect to the IDEA, whether [J.B.]

was likely to progress, and not regress, within the class." *N.M.*, 2016 WL 796857, at *6 (internal

quotation marks and citation omitted).  Based on its review of the record, the Court concludes –

consistent with the SRO Decision – that both questions have been answered affirmatively.

### B.    Capacity of PS721M to Implement IEP

The Parents' final contention is that the DOE's proposed school placement, PS721M, was

inappropriate for J.B. and would have been unable to implement the IEP.  L.B.'s June 2010 letter

to the DOE and the subsequent Due Process Complaint included a variety of allegations in

support of this argument (including the size of the school, the likelihood of insufficient

individualized attention, and the self-contained nature of the recommend classroom), but the

Parents' briefing before this Court focuses on two specific points: (i) PS721M lacked an

available opening for the 2010-11 school year; and (ii) the DOE failed to present evidence at the

impartial hearing that the placement would have provided J.B. with an appropriate group of

similarly functioning peers or with positive peer models.  Pls. Br. at 24-29; Pls. Reply Br. at 8-

10.  The Parents also argue more generally that, because the DOE's impartial hearing evidence

largely concerned the PS721M's summer program, the evidence was insufficient to establish

affirmatively that PS721M would have able to implement J.B.'s IEP across the entire

recommended twelve-month school year.  *Id.*

The IHO agreed with the Parents that the DOE failed to meet its burden of persuasion

regarding the appropriateness of the school setting because its impartial hearing presentation

lacked specific evidence about the PS721M's September - June program, did not respond to the

Parents' peer group claims, and featured testimony on the availability issue that was "not clear." IHO Decision at 10. The SRO reversed, concluding that the Parents' challenges to the PS721M placement failed at the threshold. SRO Decision at 18-20. Specifically, relying on the Court of Appeals' decision in *R.E.* and its progeny, the SRO deemed arguments that the recommended placement would have been unable to implement the IEP impermissibly speculative in light of the Parents' declination to enroll J.B. in PS721M in the first place. *Id.* Furthermore, the SRO concluded, given the Parents' unilateral rejection of PS721M, the DOE had no obligation "to present retrospective evidence at the impartial hearing regarding the execution of the student's program or to refute [the Parents'] claims." *Id.* at 19. Finally, the SRO found that, even assuming that the Parents' claims were cognizable, "the evidence in the hearing record does not support the conclusion that the [DOE] would have . . . deviated from the student's IEP in a material or substantial way" had J.B. attended PS721M. *Id.* at 20.

The permissibility of prospective challenges to recommended school placements and the evidentiary burdens attending such challenges have been much litigated in this Circuit in recent years. Due in large measure to recent developments in the law, neither the SRO Decision nor the IHO Decision on this issue is entitled to deference. After the IHO and SRO issued their decisions, the Court of Appeals clarified in *M.O. v. N.Y.C Dep't of Educ.* that "*R.E.* does not foreclose *all* prospective challenges to a child's proposed placement school" but rather "stands for the unremarkable proposition that challenges to a school district's proposed placement school must be evaluated prospectively (*i.e.*, at 'the time of the parents' placement decision') and cannot be based on mere speculation." 793 F.3d 236, 244 (2d Cir. 2015) (*per curiam*) (citing *R.E.*, 694 F.3d at 195) (emphasis in original). *M.O.* further clarified that while "it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to

adhere to that plan's mandates," it is also "not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." 793 F.3d at 244 (internal citation omitted). "In effect, parents do not need to 'send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP,' because that would be 'antithetical to the IDEA'[s] reimbursement process.'" *E.B. v. N.Y.C. Dep't of Educ.*, 15-cv-4998, 2016 WL 3826284, at *6 (S.D.N.Y. Jul. 12, 2016) (quoting *M.O.*, 793 F.3d at 244-45) (brackets in original). Examples of "facial deficiencies," as provided by the Court Appeals, include: (i) a school that was not seafood-free being unable to implement an IEP recommending a seafood-free environment for a child with a severe allergy; (ii) a school that provided only in-class OT in a group setting being unable to implement an IEP recommending one-on-one OT outside of the classroom; and (iii) a school without a second grade classroom being unable to implement an IEP recommending that the student repeat second grade. *Id.* (citing *M.O.*, 793 F.3d at 244, 245 n.7).

Still, post-*M.O.* decisions in this District have agreed that when – as here – the IEP at issue is itself adequate, "there will be few circumstances in which a parent can successfully challenge a placement if their child never attended the [recommended] school." *J.M.*, 2016 WL 1092688, at *8. Such challenges must be "narrow" and "based on the school's factual inability to implement the IEP." *E.B.*, 2016 WL 3826284, at *7. Further, "a substantive attack on the child's IEP that is couched as a challenge to the adequacy of the proposed placement is . . . not a permissible challenge – those types of challenges do not relate to the placement's capacity to implement the IEP" and, like all substantive challenges, "must be determined by reference to the written IEP itself." *J.M.*, 2016 WL 1092688, at *8 (citing *M.O.*, 793 F.3d at 245).

*M.O.* and its progeny have also substantially resolved questions regarding evidentiary

burdens in this context. It is now clear that, assuming the IEP at issue is substantively adequate, "it is incumbent upon the parents to adduce some evidence that the school could not or would not have adhered to the IEP." *Id.* (citing *M.O.*, 793 F.3d at 245-46.). While the school district generally bears the ultimate burden of persuasion as to the appropriateness of the placement, "absent a challenge based on non-speculative evidence available at the time the parents opted out of the placement, 'the school district [is] not required to present evidence of the adequacy of [the recommended placement] at the impartial hearing.'" *Id.* (quoting *M.O.*, 793 F.3d at 246); *see also F.L. v. N.Y.C. Dep't of Educ.*, 15-cv-520, 2016 WL 3211969, at *10 (S.D.N.Y. Jun. 8, 2016) (district did "not bear the burden of affirmatively proving that its recommended placement could implement [student]'s IEP, at least absent a concrete and particularized challenge to that capacity").

In the light of the foregoing, the SRO Decision and IHO Decision on the school placement issue each reflects legal error. The SRO, affording *R.E.* an overly broad construction (although one that was not foreclosed at the time), erred in its wholesale preclusion of the Parents' prospective challenges to PS721M. It is evident to the Court that at least one of the Parents' arguments – that concerning the availability of a spot for J.B. – implicates PS721M's purported "factual inability" to implement J.B.'s IEP and thus is non-speculative and of the type permitted under *M.O.* and *R.E. See, e.g., W.W. v. N.Y.C. Dep't of Educ.*, 160 F. Supp. 3d 618, 627-28 (S.D.N.Y. 2016); *cf. Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444-45 (S.D.N.Y. 2014). The SRO's alternative basis for rejecting the Parents' placement challenges – that they were unsupported by the hearing evidence – amounts to a single summary sentence devoid of the necessary analytical rigor to merit the Court's deference. *See F.B. v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 550 (S.D.N.Y. 2015) (noting, under similar circumstances, that "[c]ourts do not

defer to such conclusory assertions" (internal quotation marks omitted)).

The IHO, for its part, erred in apparently assuming that the DOE was required to produce evidence of PS721M's ability to implement J.B.'s IEP regardless of the nature of the Parents' prospective challenges. IHO Decision at 10. As noted, the recent case law reflects that, "absent a challenge *based on non-speculative evidence available at the time the parents opted out of the placement*, 'the school district [is] not required to present evidence regarding the adequacy of the [recommended placement] at the impartial hearing.'" *J.M.*, 2016 WL 1092688, at *8 (emphasis added) (brackets in original) (quoting *M.O.*, 793 F.3d at 246). That is because "there is a rebuttable presumption that the placement school is capable of fulfilling the IEP," which generally cannot be overcome by evidence based on speculation, "subjective conclusions," and "one-time observations." *E.B.*, 2016 WL 3826284, at *8-9 (also noting the corollary that "absent non-speculative evidence to the contrary," the school district is not required "to prove that the placement is adequately equipped to implement all aspects of the IEP") (internal quotation marks and brackets omitted) (collecting cases). Because, as discussed further below, the Court finds that the majority of the placement challenges raised by the Parents are improperly speculative, the DOE was entitled to this presumption and should not have been required to present evidence at the impartial hearing in response to all such challenges.

Unable to defer to either the SRO or the IHO on the school placement issue, the Court considers it *de novo*. *See, e.g., J.M.*, 2016 WL 1092688, at *9. The Parents' primary challenge to the PS721M placement, that it purportedly lacked an available spot for J.B., is based entirely on L.B.'s vague testimony that an unidentified PS721M teacher who conducted her tour of the school in June 2010 "indicated, just generally, that there were no openings" at the time. Tr. at 486-87, 502-03. While such evidence may be non-speculative, it is also outweighed by the

DOE's countervailing evidence. Indeed, the assistant principal of PS721M explicitly testified during the impartial hearing that the specific 12:1:1 class tentatively selected for J.B. had available openings during the 2010 summer program. Tr. at 34, 77, 80-81. The Parents note correctly that the assistant principal could not on cross examination definitively rule out the possibility that twelve students might technically have been registered for that class at some point prior to the start of the summer program. But she also clearly testified that, as a matter of course, PS721M maintained sufficient flexibility to accommodate DOE placements by "basically . . . admit[ing] kids as they come in," *id.* at 80-81, citing PS721M's ten 12:1:1 classrooms for ninth through twelfth grade-equivalent students and noting that they "were not filled to capacity" in the summer of 2010, *id.* at 76-77, 79-80. This evidence is sufficient for the DOE, confronted with a permissible prospective challenge by the Plaintiffs, to carry its burden of persuasion. *See, e.g., B.P. v. N.Y.C. Dep't of Educ.*, 634 Fed. App'x 845, 847-48 (2d Cir. 2015) (Summary Order) (DOE provided sufficient evidence to counter misinformation provided to parent during tour that placement school had insufficient staffing or space to provide student with one-on-one OT required by IEP); *M.C.*, 2015 WL 4464102, at *7 (crediting DOE official's testimony at impartial hearing that placement school would provide services required by IEP over parent's testimony that principal told her that school was in danger of closing); *cf. J.D. v. N.Y.C. Dep't of Educ.*, 14-cv-9424, 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that [placement school] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was factually incapable of implementing the IEP . . . .") (internal quotation marks omitted).[15]

---

[15] The Parents note repeatedly that the DOE failed to respond to L.B.'s letter of June 24, 2010 advising it of the purported lack of available spots at PS721M, among other things. *See, e.g.*, Pls. Br. at 24. While hardly laudable,

To the extent that the Parents suggest that the DOE was separately obligated to adduce affirmative evidence at the impartial hearing as to the availability of a spot at PS721M at the start of the regular academic year in September 2010 (in addition to at the start of the twelve-month year in July), that argument is clearly meritless. Courts in this District have roundly rejected similar contentions, noting that the "IDEA and New York law only require that a school district have an IEP in effect at the *beginning* of the applicable school year." *N.K.*, 961 F. Supp. 2d at 590 (internal quotation marks and brackets omitted) (emphasis in original). As J.B.'s recommended school year began with the summer program in July, evidence of the availability of the placement at that time was sufficient.[16]

Plaintiffs' remaining arguments on the recommended placement primarily concern the lack of evidence that PS721 would have provided J.B. with an appropriate peer group as well as

_____

the DOE's failure is largely irrelevant under the circumstances. That is because L.B.'s letter – rather than seeking clarification, requesting an alternative placement, or indeed soliciting any kind of response – preemptively set forth the Parents' formal and unqualified rejection of the DOE's recommended placement. Parents' Ex. C (June 24, 2010 Letter from L.B. to DOE) at 1. As such, that rejection necessarily was not based upon the DOE's lack of response. *See M.O.*, 793 F.3d at 244 ("challenges to a school district's proposed placement school must be evaluated . . . at the time of the parents' placement decision") (internal quotation marks omitted); *cf. J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 606 (S.D.N.Y. 2015) ("The Parents' action in rejecting the [recommended placement]" in light of a comment by a staff member during a tour "without engaging in a conversation with the Public School about how the school would attempt to meet [the student's] needs suggest[s] that they seek a 'veto' over school choice, rather than 'input' – a power the IDEA clearly does not grant them.") (internal quotation marks omitted).

[16] The Parent's sole reliance on *Bettinger v. N.Y.C. Bd. of Educ.*, 06-cv-6889, 2007 WL 4208560 (S.D.N.Y. Nov. 20, 2007) to argue otherwise is unavailing. The Parents cite *Bettinger* for the proposition that "[w]here programs for Summer and Fall are materially different, the DOE has an obligation to demonstrate the appropriateness of both programs to sustain its burden of proof on Prong I" of the *Burlington/Carter* framework. Pls. Br. at 26. The Court reads *Bettinger* very differently. In that case – which concerned only the *third* prong of *Burlington/Carter* (i.e., equitable considerations) – plaintiffs argued that because the student's IEP recommended a twelve-month school year and the DOE had failed to provide a twelve-month program placement by the day that the student began attending his parents' chosen private school in July of the relevant year, the plaintiffs were relieved of any obligation to cooperate with the district's placement attempts throughout July and August and were entitled tuition for the entire school year. *Id.* at *8-9. Rejecting that contention, Judge Crotty noted among, other things, that the IEP did not "require that [the student] be enrolled in a single program for an entire year, but rather, that he attend a structured program for a full 12 months" and observed, by way of support, that even the private school that the plaintiffs deemed appropriate for the student provided "separate[]" summer and September - June programs. *Id.* at *9. In the Court's view, *Bettinger* lends no support to the Parents' argument.

(to the extent that Plaintiffs continue to press such arguments) the large size of the school, the purported likelihood of insufficient individualized attention, and the prospect that a self-contained classroom would cause J.B.'s organizational and transitional skills to regress.  *See* Pls. Br. at 26-27; Parents' Ex. A (DPC) at 3.  These challenges – which are all based on the Parents' observations during their single tour of PS721M, *see* Parents' Ex. C (June 24, 2010 Letter from L.B. to DOE) – are unavailing.

First, these challenges rest purely on impermissible speculation as to the group of students with whom J.B. might ultimately share a classroom[17] and subjective beliefs as to how a particular class model, peer group, or school size would impact J.B.'s development during the course of the school year.  As such, they hardly call into question the *factual capacity* of PS721M to implement the IEP.  *See, e.g., L.C. v. N.Y.C. Dep't of Educ.*, 15-cv-4092, 2016 WL 4690411, at *4 (S.D.N.Y. Sept. 6, 2016) ("Any speculation about which students [plaintiffs' child] would have been grouped with had he attended [the placement school] is just that – speculation."); *E.B.*, 2016 WL 3826284, at *7 ("Challenges based on the noise level of the school or the potential for emotionally disturbed peer students to frustrate [the student] are . . . speculative and not proper challenges to the <u>capacity</u> of the placement school to implement the IEP.") (emphasis in original); *J.M.*, 2016 WL 1092688, at *10 ("Plaintiffs' complaint that the school is too large is an impermissible challenge because it does not relate to whether the school could implement the IEP."); *M.T. v. N.Y.C. Dep't of Educ.*, 15-cv-5226, 2016 WL 1072491, at *9 (S.D.N.Y. Feb. 26, 2016) (argument that class had "children ranging in ages, classification, and

---

[17] L.B. testified at the impartial hearing that her conclusions about J.B.'s likely peer group were based on "observation of [a] class that was presented as [one that] would be similar to the first year entrance [class]." Tr. at 486. It is undisputed that L.B. did not observe any particular set of peers with whom J.B. was set to be placed. *Id.* at 496-97. As noted, in the summer of 2010, PS721M had ten different 12:1:1 classrooms for high school grade-equivalent students, and it was "flexible" in "try[ing] to group [the students] functionally." Tr. at 77, 79-80.

functional levels to a degree inappropriate for [the student]" did not implicate school's capacity to implement IEP) (internal quotation marks omitted); *N.M.*, 2016 WL 796857, at *8 (argument that placement school would not have put student "in an appropriate classroom of peers and peer models" was "barred under *R.E.* and *M.O.*").

Relatedly, the aspects of the placement challenged by the Parents "are not contrary to any specific requirement in the IEP," and therefore do not constitute facial deficiencies on the part of PS721M. *See Y.F. v. N.Y.C. Dep't of Educ.*, 15-cv-6322, 2015 WL 4622500, at *7 (S.D.N.Y. Jul. 31, 2015) (arguments about placement school's size, curriculum, and environment impermissibly speculative when no IEP requirements violated); *see also S.E. v. N.Y.C. Dep't of Educ.*, 113 F. Supp. 3d 695, 710 (S.D.N.Y. 2015) (classroom that would allow the student "to interact with typically-developing peers" was "not mandated by the IEP" and placement in self-contained classroom therefore did not "contravene the IEP"). The Parents do not point to any specific services set forth in J.B.'s IEP that PS721M "was not capable of performing," *M.C.*, 2015 WL 4464102 at *6, and nothing in the record suggests as much. Certainly, the Parents may reasonably have believed that a classroom peer group of a certain type or a school environment of a particular sort would most effectively facilitate J.B.'s development and guard against regression, but as such scholastic features were not required by the IEP, the Parents' challenges represent precisely "the type of impermissibl[e] . . . arguments characterized by *M.O.* as substantive attacks on the IEP that are couched as challenges to the adequacy of [the placement school]." *Y.F.*, 2015 WL 4622500, at *7 (internal quotation marks and brackets omitted). Put more simply, lacking evidence that PS721M could not or would implement the IEP as actually written, the Parents' challenge must fail.

The absence of any non-speculative evidence that PS721M was factually incapable of

59

meeting the requirements and delivering the services set forth in the IEP also means, as noted

above, that the DOE is entitled to the "presumption" that the school was capable of fulfilling the

IEP and was not required to adduce evidence at the impartial hearing to that effect. *E.B.*, 2016

WL 3826284, at *8-9.  Accordingly, Plaintiffs' argument that the DOE failed to carry some

general evidentiary burden with the respect to the September - June portion of PS721M program

is without merit.  Notably, however, even though not legally required to do so, the DOE did

adduce evidence at the impartial hearing in response to several of the Parents' central concerns.

The PS721M assistant principal testified, for example, that the school grouped its students

functionally and "would have been flexible enough to another class" for J.B. if "upon

admittance, [it] found that [J.B.] was either higher or lower" in functionality level than the other

students in the class originally proposed for him.  Tr. at 79-80.  She further testified that the

students in the summer program classroom tentatively selected for J.B. largely functioned at

"between kindergarten and third grade" levels in both English language arts and math – a range

consistent with J.B.'s then-current instructional levels of approximately first or second grade in

similar subjects.  *See* Tr. at 36-37, 86-88; DOE Ex. 3 (IEP) at 3; *see also H.C. v. N.Y.C. Dep't of

Educ.,* 14–cv–1927, 2015 WL 1782742 at *4 (S.D.N.Y. Apr. 9, 2015) ("[T]he law does not

require that students be grouped with others of identical academic abilities.").

   While the Court has no shortage of sympathy for the Parents' desire that J.B. receive an

education in the environment that, in their view, was best suited to his needs, "the evaluation of

the school district's determinations can only be made based on evidence as to whether the school

would not or could not deliver a FAPE, not a parent's sense that a school might not adhere to an

IEP." *E.B.* 2016 WL 3826284, at *8 (internal quotation marks omitted).  Under that standard,

the Court can only conclude that PS721M was capable of implementing J.B.'s 2010-11 IEP.

Because the Court concludes that a preponderance of the evidence shows that the DOE offered J.B. a FAPE for the 2010-11 school year, the Court does not reach the second or third prongs of the *Burlington/Carter* framework regarding the appropriateness of the Parents' placement of J.B. at Cooke or whether the equities favor reimbursement of the Cooke tuition. *See, e.g., J.M.*, 2016 WL 1092688, at *11.

## III.    Conclusion

For the foregoing reasons, Plaintiffs' motion is DENIED, and the DOE's motion is GRANTED in full. The Clerk of Court is respectfully directed to terminate Dkt. Nos. 16 and 20 and to close this case.


SO ORDERED.

Dated: September 27 2016
       New York, New York

_____
ALISON J. NATHAN
United States District Judge